**BRYAN CAVE LEIGHTON PAISNER LLP**
K. LEE MARSHALL (CA Bar No. 277092)
Telephone: (415) 675-3444 | E-mail: lee.marshall@bclplaw.com
EMMET P. ONG (CA Bar No. 334461) (Counsel for Service)
Telephone: (415) 675-3459 | E-mail: emmet.ong@bclplaw.com
ANNA V. DONALD (CA Bar No. 352006)
Telephone: (415) 675-3438 | E-mail: anna.donald@bclplaw.com
CELESTE X. CHARLET (CA Bar No. 366299)
Telephone: (415) 675-3429 | E-mail: celeste.charlet@bclplaw.com
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070

JOHN R. BIELEMA (GA Bar No. 056832, *pro hac vice* application to come)
Telephone: (404) 572-4504 | E-mail: john.bielema@bclplaw.com
One Atlantic Center, 14th Floor
1201 W. Peachtree St., N.W.
Atlanta, GA 30309-3471

**ATHENE LAW, LLP**
LONG X. DO (CA Bar No. 211439)
Telephone: (415) 680-7419 | E-mail: long@athenelaw.com
AVI RUTSCHMAN (CA Bar No. 298922)
Telephone: (818) 688-2063 | E-mail: avi@athenelaw.com
10866 Washington Blvd., #142
Culver City, CA 90232

Attorneys for Plaintiffs

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

CALIFORNIA PRIMARY CARE ASSOCIATION, SHASTA COMMUNITY HEALTH CENTER, HILL COUNTRY COMMUNITY CLINIC, MOUNTAIN VALLEYS HEALTH CENTERS, CENTRO DE SALUD DE LA COMUNIDAD DE SAN YSIDRO, INC., and MCCLOUD HEALTHCARE CLINIC, INC.

Plaintiffs,

v.

SERVICE EMPLOYEES INTERNATIONAL UNION – UNITED HEALTHCARE WORKERS WEST and DAVE REGAN,

Defendants.

Case No.

**COMPLAINT FOR:**

**(1) VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)**

**(2) VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d), BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)**

**JURY TRIAL DEMANDED**

Plaintiffs California Primary Care Association ("CPCA"), Shasta Community Health Center, Hill Country Community Clinic, Mountain Valleys Health Centers, Centro de Salud de la Comunidad de San Ysidro, Inc., and McCloud Healthcare Clinic, Inc. (collectively, "CHC Plaintiffs") bring this action for various claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, against Defendants Service Employees International Union – United Healthcare Workers West ("UHW") and Dave Regan. Plaintiffs' allegations are based on knowledge as to their own acts, and on information and belief as to all other matters except where expressly indicated.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this complaint under 28 U.S.C. § 1331 because the complaint arises under a federal statute, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*.

2. Venue in this district is proper pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claims occurred in this district or each defendant is subject to personal jurisdiction, resides, is found, has an agent, or transacts his affairs in this district.

## INTRODUCTION

3. Every day, across California's most forgotten neighborhoods—in the farmworker communities of the Central Valley, the overcrowded urban corridors of Los Angeles, and the rural stretches where the nearest hospital is an hour away—community health centers ("CHCs") keep a promise that no one else will. They see patients who have nowhere else to go: the uninsured mother managing diabetes, the farm worker with a workplace injury and no coverage, and the child whose preventive care would otherwise go unmet. CPCA represents more than 2,300 of these not-for-profit CHCs and regional clinic associations across California, collectively serving 6.7 million unique patients each year, particularly low-income, uninsured, and underserved populations. These are not business enterprises chasing profit. They are safety-net institutions whose survival is inseparable from the health of the communities they serve.



BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

4. Since 2022, UHW and its President, Dave Regan, have orchestrated and executed a multi-year campaign of coercion, threats, and economic pressure that culminated in the unlawful use of the state ballot initiative process to extort CPCA and California's CHCs into surrendering valuable property rights and adopting labor-organizing terms demanded by Defendants. The use of a state ballot initiative to leverage a quid pro quo deal is not a resolution to a labor dispute in any traditional sense. It is a shakedown. And the patients who depend on these clinics for their lives are the ones who stand to lose the most.

5. The scheme follows a script that UHW and Regan have refined over more than a decade and that has earned them the label "ballot measure extortionist" in the California press and political world. Their extortionate acts form part of a continuous, long-running course of conduct targeting multiple sectors of the healthcare industry—including nonprofit hospitals, dialysis providers, and now CHCs—carried out through the coordinated efforts of UHW, Regan, and others in California. The playbook never changes, with UHW and Regan initially introducing burdensome or financially destructive legislation; disseminating negative and inaccurate public narratives aimed to intimidate; and leveraging political influence, media pressure, and coordinated organizational tactics to inflict escalating harm unless the targeted entities concede to Defendants' demands. While some of these tactics may not be unique to Defendants, UHW and Regan take it one step further when their goals are not met and cross a bright line that few, if any, others do. They launch punitive, harmful, and often long-shot and repetitive statewide or local ballot initiatives that are used as bargaining chips to extort broad concessions from opponents that have not otherwise capitulated.

6. In each prior campaign—against nonprofit hospitals, against dialysis clinics, again and again—Defendants filed initiatives designed not to pass, but to subjugate and terrify. In fact, UHW has filed dozens of punitive ballot measures in California alone targeting hospitals and dialysis providers with the implied threat or directly stated purpose of coercing healthcare providers into acquiescing to their union organizing or bargaining demands. They have spent over $216,000,000 qualifying and campaigning for ballot measures that independent analysts predicted would harm patients, destroy services, and drive providers out of business. Leading California

newspapers—aware of the coercive nature of these ballot measures—have editorialized that the UHW measures are “an abuse of the initiative process,” “[m]isusing the initiative process to advance unionization,” and “a form of political blackmail.” Over the past dozen years, UHW and Regan have qualified fifty state ballot initiatives and withdrew almost 85% of them, usually only after they have extorted concessions from opponents or industries that are the targets of the initiatives. No other singular entity or individual has engaged in such widespread corruption of California’s initiative process.

7. Now, Defendants have redirected this coercive sustained racketeering scheme against CPCA and CHCs, including CHC Plaintiffs, carried out through repeated predicate acts of extortion and bribery, seeking to obtain money, property, access rights, confidential information, and control over core business functions and labor-relations policies—interests that constitute “property” under federal and California law. Defendants have repeatedly chosen to circumvent the employee-driven process that Congress carefully designed under the National Labor Relations Act (“NLRA”) and instead have tried to force their demands through exploitative and harmful ballot initiatives.

8. When Defendants’ other pressure tactics failed to quickly deliver results, UHW and Regan resorted to California’s ballot initiative process as a weapon to threaten and to inflict upon CHCs severe financial and operational harm unless they agree to a so-called “neutrality agreement” that, contrary to its innocuous sounding name, imposed one-sided labor-organizing advantages for UHW. The advantages include severe conduct and communications controls and restrictions on CHCs, guaranteed access to CHC facilities and employees, compelled disclosures of personal and confidential employee information, and commitments to multi-employer bargaining, all without employee-driven support and entirely outside the statutory framework Congress established under the NLRA. The ballot initiatives at the heart of this scheme bear no rational connection to any objective consistent with Defendants’ stated mission of advocating for healthcare workers; indeed, any ostensible policy justification for these measures is a sham, designed to mask Defendants’ true purpose of extorting CPCA and CHCs into surrendering valuable property rights and business autonomy.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

9. The weapon of choice in the current campaign is the so-called "Clinic Funding Accountability and Transparency Act," now also known as "Proposition 44"—a ballot initiative that is neither about accountability nor transparency. The measure would impose arbitrary spending ratios and requirements that no CHC can realistically meet, subject CHCs to devastating financial penalties, threaten to lock up CHC patient board members, and jeopardize access to care for millions of medically underserved patients. An independent study found that the initiative, if passed, would result in 88% of evaluated clinics operating at a loss, with 91% of clinic organizations failing to meet the arbitrary 90% spend ratio requirement, exposing them to $1.7 billion in total penalties in the first year alone—money that would be ripped from patient care—and putting at risk closure of organizations responsible for up to 11.7 million patient encounters annually.

10. As UHW and Regan made explicit through direct communications and indirectly through intermediaries, this initiative would be withdrawn only if CPCA and CHCs capitulate to Defendants' organizing demands to deliver tens of thousands of CHC workers to Defendants. Indeed, UHW and Regan, with stunning audacity, e-mailed the following "offer" through an intermediary:

> **SEIU has agreed . . . that an agreement on election procedures will result in their dropping . . . the clinic-focused initiative that SEIU-UHW has introduced.**

The message delivered to CPCA was blunt: sign the neutrality agreement, which provides UHW with significant financial gains at the expense of CHCs, or CHCs will suffer the debilitating economic and political harm that the ballot initiative is designed to inflict. UHW and Regan later demanded—in exchange for pulling the CHC measure—that CPCA abandon its opposition to Defendants' billionaires' wealth tax initiative (now "Proposition 40") and redirect its ballot funding to help UHW pass the wealth tax.

11. Defendants' conduct is not ordinary advocacy or protected organizing activity or free speech; it is a calculated scheme, repeatedly deployed by Defendants, to weaponize California's ballot initiative processes to extract concessions for a top-down organizing campaign

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

that Defendants could not lawfully obtain through employee-driven, NLRA-governed procedures. This use of an initiative as leverage to obtain "money, thing of value, or advantage" is precisely the kind of coercive conduct criminalized by California Elections Code §§ 18620–18621 to protect the integrity of the initiative process.

12. Section 18620 provides for criminal liability for "[e]very person who seeks, solicits, bargains for, or obtains any money, thing of value, or advantage of or from any person, firm, or corporation for the purpose or represented purpose of fraudulently inducing, persuading, or seeking the proponent or proponents of any initiative" to abandon or otherwise prevent the initiative from moving forward.

13. Section 18621 provides for criminal liability for "[a]ny proponent of an initiative . . . who seeks, solicits, bargains for, or obtains any money or thing of value of or from any person, firm, or corporation for the purpose of abandoning the same" or otherwise prevent the initiative from moving forward.

14. Because Defendants' offer of a quid pro quo squarely violated California's criminal prohibition on corrupting the ballot initiative process, Defendants' conduct exceeds the bounds of any protected First Amendment or labor activity and instead reflects classic extortion and bribery prohibited by federal and state law. These acts of extortion and bribery, repeated across multiple campaigns and healthcare sectors over more than a decade, constitute the predicate acts forming the pattern of racketeering activity actionable under RICO. Disturbingly, Defendants have threatened to bring another ballot initiative against CHCs if Proposition 44 fails, as Regan has done with other segments of California's healthcare industry.

15. As a direct and proximate result of Defendants' racketeering activity, Plaintiffs have suffered substantial injury, including diversion of organizational resources from patient care and other non-advocacy activities, significant financial expenditures, disruption of core mission-related work, and ongoing harm to their business and property interests.

16. CPCA and CHC Plaintiffs bring this action under RICO to halt Defendants' unlawful scheme, to recover treble damages for the injuries inflicted, and to obtain all other relief necessary to protect CHCs and the communities they serve. The communities that built these

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

clinics, that rely on them for care they can find nowhere else, cannot afford to lose them to extortion and bribery.

**THE PARTIES**

17. Plaintiff CPCA is a nonprofit public benefit California corporation with its principal place of business located at 1231 I Street, Suite 400, Sacramento, California 95814. Formed in 1994, CPCA represents the interests of more than 2,300 not-for-profit CHCs and regional clinic associations in California that provide comprehensive healthcare services to 6.7 million unique patients each year, particularly to low-income, uninsured, and underserved populations. CPCA's mission is to lead and position community clinics, health centers, and networks through advocacy, education, and services as key players in the healthcare delivery system to improve the health status of their communities. CPCA's members include community and free clinics, federally funded and federally designated clinics, rural and urban clinics, large and small clinic organizations, and clinics dedicated to special needs and special populations. The services provided by CHCs include comprehensive primary and preventive care, women's health, dental care, mental health, substance use treatment, health education, outreach and enrollment, and pharmacy services. The Federal Bureau of Primary Health Care has designated CPCA as the state primary care association. Member dues fund, among other things, CPCA's legal and legislative advocacy for CHCs statewide, and training, education, and data analytics related to quality-of-care improvements. CPCA also receives federal program support to develop and enhance services for California clinics.

18. Plaintiff Shasta Community Health Center ("Shasta Community") is a nonprofit public benefit California corporation and federally qualified health center with its principal place of business in Redding, Shasta County, California. Shasta Community operates multiple clinic sites in Shasta County and surrounding communities, providing comprehensive primary care, behavioral health, dental, and other healthcare services to medically underserved populations, including low-income, uninsured, and underinsured patients. Shasta Community is a CHC member of CPCA.

19. Plaintiff Hill Country Community Clinic ("Hill Country") is a nonprofit public benefit California corporation and federally qualified health center with its principal place of business in Round Mountain, Shasta County, California. Hill Country provides comprehensive primary care, behavioral health, dental, and other healthcare services to rural and medically underserved communities in eastern Shasta County and surrounding areas through clinics located in Round Mountain, Redding, and neighboring communities. Hill Country is a CHC member of CPCA.

20. Plaintiff Mountain Valleys Health Centers ("Mountain Valleys") is a nonprofit public benefit California corporation and federally qualified health center with its principal place of business in Bieber, Lassen County, California. Mountain Valleys operates clinic sites across rural northeastern California, including locations in Bieber, Burney, Dorris, Fall River Mills, Tulelake, Mount Shasta, and Weed, providing comprehensive primary care, behavioral health, dental, and other healthcare services to geographically isolated and medically underserved populations. Mountain Valleys is a CHC member of CPCA.

21. Plaintiff Centro de Salud de la Comunidad de San Ysidro, Inc., DBA San Ysidro Health ("San Ysidro Health") is a nonprofit public benefit California corporation and federally qualified health center with its principal place of business in San Ysidro, San Diego County, California. San Ysidro Health operates numerous clinic sites throughout San Diego County, providing comprehensive primary care, pediatric, behavioral health, dental, women's health, and other healthcare services to communities across San Diego County, including low-income, uninsured, underinsured, and medically underserved populations. San Ysidro Health is a CHC member of CPCA.

22. Plaintiff McCloud Healthcare Clinic, Inc., DBA Shasta Cascade Health Centers ("Shasta Cascade"), is a not-for-profit, tax-exempt public benefit California corporation and federally qualified health center with its principal place of business in Siskiyou County, California. Shasta Cascade operates three health center sites in south Siskiyou County, providing comprehensive primary care, pediatric, dental, women's health, behavioral health, and other

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

healthcare services to medically underserved populations in that region. Shasta Cascade is a CHC member of CPCA.

23. Defendant UHW is an unincorporated labor association with its principal place of business located at 560 Thomas L Berkley Way, Oakland, California 94612. UHW represents, among others, individuals working in California's hospitals and clinics as nurses, aides, assistants, case managers, clerks, coordinators, counselors, food service workers, maintenance workers, secretaries, schedulers, technicians, respiratory care practitioners, therapists, transporters, and housekeeping staff and attempts to negotiate terms and conditions of employment for the healthcare workers it represents. Defendant UHW is a local union affiliate of Service Employees International Union ("SEIU International"). Local affiliates cooperate with SEIU International on promoting candidates and political positions and provide local chapter dues, known as "per capita taxes," to SEIU International to support political and lobbying activities through wire transfers and other interstate facilities. For example, in 2023, SEIU International collected $287.9 million in per capita taxes from local affiliates, including $2.9 million from UHW. SEIU International spent nearly $50 million on political activities and lobbying, including $500,000 on a California ballot initiative.

24. Defendant Dave Regan has been the President of UHW since 2011 and is also a Vice President of SEIU International and another SEIU International California-based affiliate ("Union Affiliate A"). In these capacities, Regan has developed, coordinated, directed, approved, and furthered the campaign of extortion and bribery against Plaintiffs. Regan resides in Sacramento, California. He transacts business on behalf of UHW and SEIU International on a national scale, including in this judicial district. In 2015, Regan led the effort to provide startup funding for a nationwide organization, The Fairness Project, which works with state partners across the country to file ballot initiatives in more than 20 states, including California.

25. Non-party SEIU International is an unincorporated labor association with its principal place of business located at 1800 Massachusetts Avenue, N.W., Washington, D.C. 20036. SEIU International centralizes revenue, jurisdiction, governance, and disciplinary authority in a single organization that can direct organizing and political power at scale.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

## FACTUAL ALLEGATIONS

### A. Defendants' Circumvention of the NLRA Framework for Labor Organizing

26. The NLRA establishes a comprehensive, employee-driven framework governing union organizing and representation in the private sector. Under that framework, employees—not unions or employers—control whether to seek union representation and which union shall represent their interests. A union may invoke the statutory representation process only after demonstrating sufficient employee interest, typically by obtaining signed authorization cards from at least thirty percent of employees in an appropriate bargaining unit.

27. If that threshold is met, the National Labor Relations Board ("NLRB") conducts a secret-ballot election in which employees are free to vote for or against union representation. During this process, employees are entitled to hear competing viewpoints, ask questions, and engage in debate concerning the advantages and disadvantages of unionization. Employers retain the right to communicate factually and lawfully with their employees, and employees retain the right to accept or reject union representation without coercion.

28. Only if a majority of employees voting in an NLRB-supervised election choose representation, or an employer lawfully recognizes a union based on evidence of uncoerced majority employee support, does a union become the exclusive bargaining representative, at which point the employer and union are obligated to engage in good-faith collective bargaining. This bottom-up, employee-choice-centered process reflects Congress's deliberate balance between protecting organizing activity and safeguarding employee free choice.

29. Unionization of employees directly translates to increased membership for a union, and the strength of the union and its scope of influence can depend on its membership size. Increased membership numbers also yield greater collection of membership dues that can directly enhance a union's power and operations. Regan took the helm of UHW around 2010, touting a track record of doubling the membership number of the Midwest union that he previously led.

30. In recent years, however, UHW has seen its membership numbers decrease or stagnate. Defendants have targeted CHCs as fertile ground to increase UHW's union membership and dues revenue, and moreover have taken aim at CPCA due to its status as the designated

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

statewide association representing CHCs. This is the same approach previously taken by UHW against other participants in California's healthcare sector—targeting hospitals and dialysis centers—to secure neutrality agreements aimed at increasing UHW membership throughout the state.

31. Rather than undertake the time-consuming process under the NLRA of convincing employees at particular CHCs not only to vote to unionize but also to be represented by UHW, Defendants have demanded that CPCA agree to organizing and neutrality policies or agreements that would apply to all CHCs and that are designed to virtually guarantee increased unionization at CHCs throughout California.

32. Neutrality agreements are private contractual arrangements between the employer and a specific union under which an employer agrees to supplemental regulations above and beyond what is required by the labor laws, including refraining from communicating its views about unionization, granting union organizers access to its property and employees, providing personal information of employees to the union's management, and committing to expedited or non-statutory union recognition procedures. These agreements are typically imposed before, and in many cases in lieu of, any demonstration of genuine employee interest. While neutrality agreements are not unlawful in concept, Defendants so intensely coveted a neutrality agreement with California's hospitals, dialysis centers, and CHCs that they were willing to delve into unlawful conduct in their efforts to obtain one.

33. From Defendants' perspective, neutrality agreements are invaluable because they shift the organizing terrain entirely in the union's favor. By silencing the employer, gaining access to facilities and employee information, and bypassing the NLRB's election safeguards, neutrality agreements eliminate the risk that employees will reject union representation in a secret-ballot vote. In the instant case, UHW's neutrality agreement is much more than that—it demands that CPCA bring to the table hundreds of CHC sites representing 25,000 workers over the course of five years without first requiring UHW to demonstrate employee interest at those clinics. In other words, UHW sought concessions from CPCA that the union believed would yield an additional 25,000 dues-paying members at CHCs.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

34. Neutrality agreements also serve Defendants' financial and institutional interests. Once recognition is secured—whether or not it reflects employee free choice—the union gains a stream of dues revenue, leverage over workplace operations, and a mandatory seat at the bargaining table. The increased revenue would feed directly into compensation packages for UHW's executives and staff. The employer, by contrast, is compelled to surrender significant autonomy over its communications, facilities, labor relations strategy, and core business and clinical operations.

**B. Defendants Escalated a Conventional Corporate Campaign Into an Unlawful Extortion and Bribery Scheme**

35. Since around 2011, Defendants have engaged in an extensive and well-honed pressure campaign directed at California hospitals, dialysis centers, and CHCs to extract concessions for neutrality and organizing agreements. With the coordination and involvement of its allies, UHW and Regan initially generally hewed to tactics commonly known as a "corporate campaign" often utilized by unions, including by SEIU International with which UHW is affiliated.

36. As several federal courts have noted, a union corporate campaign: "encompasses a wide and indefinite range of legal and potentially ***illegal tactics*** used by unions to exert pressure on an employer . . . [including] litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state or federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public." *Food Lion, Inc. v. UFCW*, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997) (quoted by *Smithfield Foods, Inc. v. UFCW*, 633 F. Supp. 2d 214, 219 (E.D. Va. 2008)) (emphasis added).

37. Unions and their executives have been transparent about the purposes and uses of such tactics. SEIU International published a manual that touts finding an adversary's business and political pressure points to exploit for leverage, identifying ways to cost an employer money by threatening or actually reducing productivity and increasing operational costs; or even "[a]ffect[ing] a public employer's relationship with legislators or top government executives" and "[c]reat[ing] bad publicity." "[P]olitical pressure," according to the manual, serves two key

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

purposes: (1) to "draw politicians into" the union's campaign; and (2) to send a message to management officials that if they fail to meet union demands, "union members will be more inclined to push for legislative action on other issues that would affect management." Such pressure and coercion are designed and intended to circumvent the NLRA's organizing processes that are founded on employee choice to unionize. Unions engaged in these tactics are not focused on the interests of employees, as articulated by former United Food and Commercial Workers International Union organizer Joe Crump:

> Who do we really need to convince of the advantages of being union? Employees or employers. Organizing without the NLRB means putting enough pressure on employers, costing them enough time, energy and money to either eliminate them or get them to surrender to the union. . . . One of the concerns organizers might have about waging economic war on an unorganized company is that it might turn employees against the union. I look at it this way: If you had massive employee support, you probably would be conducting a traditional organizing campaign.

38. The manual also instructs union executives, not lawyers, to decide when and how to obey the law, stating that "the job of [the union's] lawyers is not to make the decisions for us about when and how to obey the laws," and that counsel's role is limited to advising on legal risk so that the union's "elected leaders must then weigh the risks and benefits of potential actions." The manual justifies disregarding legal constraints on the premise that illegal conduct will often go unchallenged: because litigation exposes an employer to discovery of its internal documents and witnesses, generates unwanted publicity, and because unlawful acts may nonetheless strike the public, media, or customers as justifiable, an employer confronted with sufficient pressure may lack the will to pursue a remedy, and even if the union is found guilty or liable, that may yield only minimal penalties or provable damages. Read together, these passages frame illegality not as a line that union executives must avoid, but as one variable in a calculated cost-benefit analysis to be embraced whenever it maximizes coercive pressure on the targeted employer.

39. Defendants' corporate campaigns begin with the creation and dissemination of a negative public narrative. Defendants introduce this narrative through reports, press statements, or advocacy materials that exaggerate and distort facts in order to establish a campaign "theme," portraying the healthcare provider as unethical, dangerous, and socially irresponsible. Once

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

established, Defendants seek to reinforce that theme through escalating tactics intended to "prove" the alleged misconduct. The nature of these tactics is limited only by the creativity of the union's management, and they can include everything from demonstrations and "street theater" to legislative, regulatory, and legal attacks, misinformation campaigns, and assaults on business affiliations, opportunities, and customers. In their corporate campaigns against the hospitals, dialysis centers, and CPCA and its CHC members, Defendants' tactics included all the above and devolved into outright illegal conduct.

**C. California Criminalizes Defendants' Corruption of the Ballot Initiative Process**

40. Due to the failures of their traditional corporate campaign against California's healthcare sector, Defendants resorted to a new and dramatically different tactic that few, if any, other unions utilize because it involves blatantly illegal conduct: targeting the provider with a punitive and reckless state ballot initiative and offering to drop the measure if the provider agrees to their labor demands. Defendants' strategy is not just immoral and unethical—particularly when it jeopardizes access to healthcare for California's most vulnerable communities—it is a ***felony*** under California law.

41. Since at least April 2011, the California Elections Code has had in place a comprehensive statutory scheme to address the corruption of California's ballot initiative processes.

42. Section 18620 provides for criminal liability for "[e]very person who seeks, solicits, bargains for, or obtains any money, thing of value, or advantage of or from any person, firm, or corporation for the purpose or represented purpose of fraudulently inducing, persuading, or seeking the proponent or proponents of any initiative" to abandon or otherwise prevent the initiative from moving forward.

43. Section 18621 provides for criminal liability for any "[a]ny proponent of an initiative . . . who seeks, solicits, bargains for, or obtains any money or thing of value of or from any person, firm, or corporation for the purpose of abandoning the same" or otherwise prevent the initiative from moving forward.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

44. The two sections work in tandem to cover the full range of criminal misuse of California's ballot initiative process. Section 18620 targets those who seek money in exchange for causing abandonment of an initiative, while section 18621 targets proponents who seek compensation to undermine their own initiatives. This dual approach ensures that prosecution is possible for different forms of corrupt transactions involving the initiative process. The statutes recognize that corruption can occur at any stage of the initiative process, thereby providing broad protection for the integrity of California's direct democracy mechanisms.

45. Both sections carry identical penalties of up to $5,000 in fines and imprisonment options including 16 months, two years, or three years in state prison, or up to one year in county jail. In other words, a violation of either section is a felony.

**D. Defendants' Pattern of Racketeering Activity**

46. Defendants' motive for engaging in these corporate campaigns and coordinated extortion tactics against CHCs and others is simple: capture the entire market share through forced unionization with the ultimate goal of increased profitability and compensation for UHW and its union leaders. By coercing employers into neutrality agreements that require a designated number of employers with represented workers to sign the agreement, Defendants seek to rapidly expand the number of dues-paying workers under their control.

47. UHW derives the overwhelming majority of its revenue from dues paid by union members. These dues constitute the primary funding mechanism for the union's operations, staff salaries, political activities, and leadership compensation. As a result, the financial health of UHW is directly tied to the size of its union membership.

48. For example, over the past decade, UHW has experienced a significant and well-documented decline in its membership. The union reported 138,544 members in 2014, but that number fell to 86,658 in 2015, and even by 2024—after nearly a decade of aggressive campaigning activity—it reported only 124,106 members. This decline in membership directly threatens the dues-based revenue stream that funds UHW's operations and, more importantly, staff and leadership compensation.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

49. According to UHW's tax filing for 2024, it spent $72.0 million—approximately half—of its $145.9 million in revenues on its own staff compensation, perks, and benefits. Meanwhile, UHW spent only $6.3 million—a paltry 4.3% of its revenues—on negotiating new labor agreements.

50. Regan, in particular, was handsomely paid by UHW in 2023, raking in approximately $420,263 in compensation. Translated to a 40-hour work week, Regan was paid approximately $202 per hour, or more than ***eight times*** the $25 minimum hourly wage for healthcare workers in California. On information and belief, Regan increased the maximum dues of UHW's members to pay for his salary. For example, in January 2014, he reportedly increased the maximum dues from $110 per month to $124 per month while also eliminating the pensions of 20,000 workers.

51. Thus, shoring up their membership numbers creates a clear motive for Defendants to employ the punitive ballot measures as leverage in labor negotiations, because expanding the number of represented workers directly increases the union's financial stability, compensation for leaders, and institutional influence. Indeed, the financial stakes of Defendants' demands are staggering: with average UHW dues of approximately $94.82 per member per month as reported in UHW's 2023 LM-2 filings, the 25,000 workers Defendants demanded from CPCA and its member CHCs through the Election Procedure Agreement discussed below would generate approximately $2.37 million in new monthly dues revenue.

52. Through these efforts, Defendants also seek to gain an unfair advantage over competing labor organizations by securing direct access to employees through employer-provided information and workplace entry rights that rival unions do not possess. By coercing employers into granting Defendants exclusive organizing privileges, Defendants aim to foreclose competition and better position themselves to recruit union members. In doing so, Defendants also seek to foreclose the free choice of employees to unionize and, if so, with whom, in order to establish themselves as the only union available for healthcare employees in California, including CPCA's member CHCs.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

53. Since his election as UHW's President in 2011, Regan and UHW, joined at times by others, have launched a series of corporate campaigns targeting different sectors of California's healthcare industry. Defendants employed the same playbook in each case: sponsor a financially punitive ballot initiative and—in violation of California criminal law—offer to pull the initiative for labor concessions.

**1. Nonprofit Hospitals**

54. Regan and UHW's campaign of unlawful conduct started with California's nonprofit hospitals.

55. On November 23, 2011, Tina McClain and Fabunimi Sands submitted a letter to the Attorney General of California requesting that a ballot title be issued for Initiative No. 11-0075, which they entitled "Fair Healthcare Pricing Act of 2012." McClain was and still is a union representative and organizer employed by UHW.

56. Initiative No. 11-0075, which was given the ballot title, "Limits on Hospital Charges. Initiative Statute.," was designed to impose economic and legal penalties on nonprofit hospitals that were not part of an SEIU International-affiliated California union. The initiative would limit how hospitals charge for care provided. The measure also imposed new onerous reporting requirements and penalties for noncompliance.

57. Also on November 23, 2011, Jimi Hardy and Nisa L. Walker requested a ballot title for Initiative No. 11-0081, which they entitled "The Charity Care Act of 2012." At the time, Hardy, one of the initiative's proponents, was a contract specialist employed by UHW. Hardy was also a UHW Executive Board Member, political action leader, and a leader of its "Let's Get Healthy California" corporate campaign.

58. Initiative No. 11-0081, which was given the ballot title, "Nonprofit Hospitals. Required Minimum Charity Care. Initiative Statute.," also targeted non-SEIU International California hospitals with economic and legal jeopardy. This initiative established requirements for free healthcare provided by non-SEIU International hospitals without regard to circumstances that could impact a hospital's ability to do so. The measure subjected such hospitals to additional reporting requirements, penalties for noncompliance (including revocation of tax-exempt status),

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

and personal liability for directors and officers. California law did not require non-profit hospitals to provide a specific amount of charity care.

59. Defendants made little effort to hide that their real objective was to extract labor concessions from the hospital industry in exchange for withdrawing the measures. For example, on November 28, 2011, an SEIU International local affiliate in California issued a press release plainly stating, "[t]he ballot initiatives are one piece of 'Let's Get Healthy California!'" corporate campaign and that "[u]nder this banner healthcare workers will negotiate contracts, introduce legislation and work with partner organizations to . . . improve healthcare jobs." The press release also included a quote by Regan expressing his support for the measures.

60. A Beyond the Chron article, dated November 29, 2011, by progressive author and activist Randy Shaw, questioned UHW's real motives, noting that restraining hospital costs had not been a priority for UHW and criticizing it for aligning with Kaiser and other healthcare giants. The article explained that "the likelihood of UHW qualifying and then passing these measures next November is virtually nil," citing the inability of UHW to "raise the funds necessary to qualify the measures (not to mention financing and assembling the field campaign for passage)." Shaw (accurately) prognosticated "UHW dropping the initiatives as part of an overall 'deal' with hospitals, and then claiming it has won a huge victory for consumers." He explained that UHW was "squandering resources" on a "rebranding" exercise to compete against other larger and more successful unions.

61. On February 3, 2012, the San Francisco Chronicle reported that UHW had begun collecting signatures for the two ballot measures. The article quoted Regan as saying the union's executive board had authorized $5.5 million to pay for the signature gathering and start of the campaign. According to the article, a review by California's non-partisan Legislative Analyst's Office and the Department of Finance, Initiative No. 11-0075, if passed, could lead hospitals to eliminate services and products with smaller profit margins and limit services for uninsured patients. Regarding Initiative No. 11-0081, which exempted a third of nonprofit hospitals, it could cause hospitals to raise rates, reduce staff, and cut or eliminate services with low profit margins.

62. A Los Angeles Times article, dated March 10, 2012, also laid bare the truth: that the measures were not about reining in healthcare costs and improving patient care, but using the threat of the ballot box as a blunt instrument to coerce hospitals into organizing on the unions' terms. As stated by a spokeswoman for the California Hospital Association ("CHA")—which, in a role similar to CPCA's, is an advocacy group for nearly 400 hospitals in California—"This is really about a union using the initiative process to try to get targeted hospitals to buckle to their union demands."

63. Indeed, as reported in the article, "[u]nspoken in the public pitch was the fact that the measures, backed by the Service Employees International Union and aimed at private hospitals, would have a major effect on facilities the union has tried unsuccessfully to organize, while exempting those where many of its members work." The article noted that Dignity Health, the state's largest hospital chain, and Kaiser Permanente, the largest HMO, would not be subject to the proposals, because the union represented nearly 60,000 workers in those two systems.

64. The article further reported that, according to consumer advocates, the proposals would fail to eliminate problems of medical inflation and inadequate charity care. This is because, according to the Legislative Analyst's Office, at least a quarter of California's private hospitals and all public hospitals would be exempted from the measures. Therefore, the measures would do little but confer a competitive advantage to the already dominant players in California. Jamie Court, president of Consumer Watchdog, a Santa Monica-based advocacy group, likened the measures to a hypothetical marijuana regulation that left out Humboldt County, stating, "'There's no good reason' to exclude Kaiser and Dignity, 'two of the largest providers in the state.'" Regan acknowledged the shortcomings of the initiatives, conceding that "[t]he initiatives [would] affect three-fourths of the industry" only and admitted that it was "convenient for Kaiser" and Dignity that they were specifically excluded.

65. Under California law, UHW, as the sponsor of the petition drive to qualify these initiatives for the ballot, had until June 18, 2012, to gather the more than 500,000 signatures needed for qualification.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

66. But, on May 2, 2012, the Los Angeles Times reported that UHW agreed to drop the ballot initiatives "in exchange for an agreement that, among other things, enlists the hospital industry in the union's organizing efforts." According to the article, CHA "pledge[d] to facilitate meetings between the SEIU and CEOs of hospitals and health systems employing 100,000 non-union workers. . . . In turn, the SEIU agreed not to file petition signatures with county election officials and the secretary of state's office." According to other reporting, UHW had gathered about 850,000 signatures for each initiative. Regan was quoted in the Los Angeles Times article as saying that the agreement was a way "to make durable, lasting, meaningful change" to the existing system. The deal reportedly ended a months-long public battle, during which the hospitals had accused the union of using the initiative process as leverage in contract negotiations to expand its membership.

67. Apparently dissatisfied with this outcome and the progress of organizing the nonprofit hospitals, UHW and Regan tried their hand again at extorting the hospital industry using the same playbook of filing a punitive initiative and offering to withdraw it in exchange for a labor agreement.

68. On November 8, 2013, Rebecca Malberg and Stanley Lyles requested a ballot title for Initiative No. 13-0041, "Fair Healthcare Pricing Act of 2014," and Initiative No. 13-0042, "Charitable Hospital Executive Compensation Act of 2014." At the time, the initiatives' proponents were both employed by UHW. Malberg was UHW's Home Care Division Director and a member of its Executive Committee. Lyles was UHW's Vice President and remained in that position through 2025.

69. Initiative No. 13-0041, which was given the ballot title, "Healthcare Service Charges. Initiative Statute," was substantially similar to Initiative No. 11-0075, prohibiting hospitals from charging more than 25% above the estimated cost of goods and services provided to patients. Like the prior measure, it also contained burdensome reporting requirements and stiff penalties for noncompliance, and focused its prohibition on hospitals where UHW did not have a large presence (public, children, and Veterans Affairs hospitals were exempted).

70. Initiative No. 13-0042, which was given the ballot title, "Nonprofit Hospitals. Executive Compensation. Initiative Statute," would have capped the pay for nonprofit hospital executives in California at $450,000 annually and imposed harsh penalties for noncompliance.

71. Like the prior proposed measures, the 2014 initiatives would have hurt patient care while doing little to address rising medical costs. The Legislative Analyst's Office had found that the pricing measure in particular would cause revenue losses in a majority of private hospitals, causing about 20 hospitals to go from being profitable to operating in the red, and perhaps closing others altogether. According to CHA, no patients actually pay the inflated charges targeted by Initiative No. 13-0041 because private insurers negotiate deep discounts and charity care programs shield the uninsured and other low-income people from the full amount. Rather, CHA estimated that capping charges would cut $12 billion annually from hospital revenues statewide, triggering widespread cutbacks in services and staffing. CHA criticized UHW's use of the initiatives as leverage in their negotiations with hospitals regarding organizing efforts. One health economist at the University of Southern California agreed, stating that if such a measure would have passed, then hospitals would have had less revenue, meaning they would have had less money to spend on wages and salaries of their employees.

72. A Los Angeles Times article, dated December 3, 2013, cast a spotlight on UHW's tactic of "using the ballot initiative process and SEIU's money to basically shake down the hospitals," as described by the head of Consumer Watchdog, a consumer advocacy group. The Times reported CHA's president as saying that Regan had "expressed disappointment" to him over progress on UHW's organizing goals because "SEIU expected elections covering 20,000 employees in hospitals under a mutually developed code of conduct." While Regan reportedly took issue with CHA's characterization, he did not deny that the initiatives were being wielded as sticks to achieve labor goals, admitting to the Times that organizing was part of the parties' discussions. The article further reported Regan as saying that the union was prepared to spend $4 million to collect signatures to qualify its measures for the ballot, and up to $20 million to campaign for their passage, but also that the two sides were still talking, and UHW could decide to pull the plug on the initiatives. The article also quoted Steve Trossman, UHW's

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

communications director, as saying that the organizing efforts had been a "very explicit" part of the negotiations. Trossman further stated: "If we could reach an agreement" on the broad labor issues, "then we would definitely consider dropping the initiatives."

73. UHW had until June 2, 2014, to collect and submit the approximately 500,000 signatures required to qualify the measures for the ballot.

74. However, on May 6, 2014, the Los Angeles Times reported that the parties once again reached a deal, whereby "the Service Employees International Union-United Healthcare Workers West dropped proposed ballot initiatives to limit hospital charges and cap what nonprofit hospitals pay their executives." The article reported that, "[i]n return, the California Hospital Assn. and a majority of the state's 430 hospitals approved a new 'code of conduct' that may make it easier for the union to organize workers." The article noted: "In 2012, the two sides struck a similar agreement to head off another ballot measure. But that deal didn't help Service Employees' organizing efforts to any large degree, so tensions flared anew." Professor Nelson Lichtenstein, director for UC Santa Barbara's Center for the Study of Work, Labor, and Democracy, criticized the deal, expressing doubt that it would produce much meaningful change either in terms of union membership or healthcare policy and noting that "SEIU has done this numerous times in the past and it tends to fall apart." Sal Rosselli, the leader of a rival union, stated that the agreement would undermine the rights of workers.

75. In the article, Regan acknowledged these criticisms, but stressed that it was essential for UHW and other unions to survive, stating, "This is one approach that ought to be looked at as we're trying to reinvent a union movement that is in steep, steep decline." Regan reportedly defended the deal as a better use of millions of dollars that could be wasted on a ballot campaign, stating, "Rather than take $100 million and fight each other where the prospects of success are totally unclear and up in the air . . . , we will take a huge amount of resources and attack the problem together." But Regan's argument was a red herring, designed to deflect attention from the fact that his and UHW's unlawful actions created the very crisis they now decry.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

76. In a letter addressed to the California legislature and signed by Regan, Regan openly proclaimed that the agreement provided for "a code of conduct that will govern conversations between union representatives and hospital employees" and that "SEIU-UHW's two hospital ballot initiatives . . . will not be pursued."

77. In a Healthcare Finance article, dated August 22, 2014, one industry observer drew attention to the obvious; namely, that the end goal for the initiatives was "to force the CHA to the table to get what the unions want – organizing people and getting more members," citing doubts that "SEIU wanted an all-out war." The article reported that Regan assailed and threatened the hospitals that did not sign the agreement, stating: "We're going to continue to be public and beat them up and raise all the stuff that drives you crazy or you're going to figure out how to get those guys to heel."

78. Indeed, as Regan predicted, the truce did not last long. On November 20, 2015, UHW tried to extort the hospital industry once again, submitting Initiative No. 15-0111, "Hospital Executive Compensation Act of 2016," for a ballot title. The proponents of the initiative were Benjamen Tracey and Nathan Selzer, both of whom were employed by UHW. Selzer was a Director and Tracey was an Assistant Director with UHW. Like the 2014 measure, the 2016 initiative would limit healthcare executive compensation to $450,000.

79. But this time, UHW was forced to withdraw the proposed measures after an arbitrator decided that UHW had reneged on its 2014 agreement with CHA. The arbitrator's award described, in striking detail, UHW and Regan's playbook of filing ballot initiatives and then offering to withdraw them in exchange for valuable labor concessions.

80. In the opinion and award, dated June 6, 2016, the arbitrator explained the parties' May 2014 code of conduct agreement was expressly "contingent upon SEIU UHW not pursuing its pending Fair Healthcare Pricing Act of 2014 and Charitable Hospital Executive Compensation Act." But this standstill agreement was conditional on UHW and CHA hospitals, by January 1, 2016, executing conditional agreements providing UHW with access rights to hospitals comprising at least 30,000 non-union, non-supervisory employees.

81. The opinion also highlighted Regan's role, noting that "on numerous occasions Regan reminded CHA that UHW would file ballot initiatives . . . absent progress on organizing agreements." The order continued: "In particular, in a July 27 email and at the July 28 [labor management committee] meeting, Regan alerted CHA that if they didn't get the signatures for the 30,000 positions, the Union would file an initiative on executive compensation. . . . At the same time, Regan indicated that the initiative would be withdrawn if the 30,000 signatures were submitted."

82. The arbitrator also found that Tracey and Selzer, despite being the named proponents of the executive compensation initiative, were merely UHW's "surrogates." The arbitrator pointed to UHW's extensive support and control of the development of the executive compensation initiative, including:

- Threatening to file the initiative
- Drafting the initiative
- Hiring consultants and authorizing them to conduct polling
- Providing Selzer and Tracey with the final language of the initiative to be filed with the California Attorney General
- Developing a campaign plan
- Contributing $3 million to a political fund to support the initiative
- Announcing the submission of signatures in support

83. The arbitrator also noted that "in connection with prior initiatives, and with other employees as proponents, UHW successfully caused filed initiatives to be effectively withdrawn." The arbitrator concluded that UHW was "responsible for the 2016 Executive Compensation initiative" and was "fully capable of determining its future course."

84. With its statewide campaign having failed, UHW and Regan narrowed their focus on hospitals in the San Francisco Bay Area. On December 19, 2017, UHW issued a press release announcing that ballot initiatives were filed in five Bay Area cities, including Measure F in Palo Alto and Measure U in Livermore. The measures would prohibit healthcare providers in these cities from charging more than 15% above the cost of a medical service and force providers to

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

offer rebates for surplus costs. This time, UHW's target was Stanford University Medical Center in Palo Alto plus its affiliated hospitals in the Bay Area that were not represented by UHW.

85. These initiatives were filed shortly after Regan's brazen admission that UHW uses ballot measures "as a tool to exert union strength in bargaining," according to the minutes of a UHW executive board meeting on August 5, 2017.

86. In an editorial dated September 21, 2018, by the Palo Alto Weekly, the newspaper urged voters to vote "no" on Measure F. The newspaper explained that Measure F would not only fail to help consumers and create perverse incentives for medical centers to cut staffing levels, but would also saddle Palo Alto with the need to hire a staff of experts to analyze and oversee the charges being made by almost all medical professionals, including individual practitioners, dentists and orthodontists practicing in Palo Alto. The article also pointed to criticisms of the measure saying that "the real motive of the union's aggressive attempts to place these initiative measures on local ballots is to intimidate non-union hospitals to consent to unionization in exchange for the union not using the initiative process to impose price controls."

87. The Palo Alto Daily Post, in an editorial dated October 10, 2018, called Measure F "a reckless attempt by a labor union, SEIU-UHW, to gain more bargaining power by reducing medical services available to residents." It cited Stanford's belief that the measure was "retaliation because the hospital didn't agree to a 'neutrality clause' that would allow union organizers to recruit employees at Stanford facilities in Redwood City, Emeryville, Pleasanton and Livermore." It also noted that Measure F would force Stanford to cut its operating revenues by 25% or $1 billion a year, requiring it to lay off workers, eliminate departments, and reduce the amount of care it provides to the poor.

88. Similarly, the Mercury News, in an October 13, 2018 editorial, urged voters to reject the measures as being "put on the ballot by SEIU-UHW . . . with the likely intent of gaining leverage in contract bargaining." The article rejected UHW's "ludicrous" protestations that the measure was designed with the sole intent of lowering costs, explaining that UHW knew better.

89. Measure F and Measure U would have been financially ruinous for Palo Alto and Livermore, with one study showing first-year costs of $750,000 to $1 million for recruitment

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

costs, software, equipment and consulting services and $1.9 million in ongoing operating costs for the first year and subsequent years.

90. The voters overwhelmingly rejected both measures, with 76% and 81% voting "no" on Measure F and Measure U, respectively. But victory at the ballot box was obtained at a significant cost, with Stanford Healthcare and other potentially affected hospitals reportedly spending more than $5.3 million to defeat the measures.

91. Undeterred by these setbacks, UHW and Regan have continued using the same playbook to grind down the resolve of the hospital industry to hold out. On July 15, 2025, UHW employees Shelbi Augustus and Jonathan Everhart filed Initiative No. 25-0009, entitled "the Health Care Executive Compensation Act of 2026," which again sought to limit the compensation of nonprofit hospital executives to $450,000 annually. UHW employs Augustus as a Political Coordinator. Everhart is also a UHW Coordinator.

92. On November 12, 2025, the California Secretary of State reported UHW's campaign had collected at least 25% of signatures required. Thereafter, UHW continued its signature-gathering effort and, by April 2026, submitted sufficient signatures for verification.

93. On May 12, 2026, the Secretary of State announced that the initiative had become eligible for the November 2026 General Election ballot after election officials determined that the measure had exceeded the number of valid signatures required for qualification.

94. Despite having qualified for the ballot, the initiative never reached California voters. On June 25, 2026, UHW withdrew the initiative after reaching an agreement with CHA.

**2. Dialysis Centers**

95. In 2017, in the aftermath of one of their initial failed attempts to extort the hospital industry, UHW and Regan set their sights on dialysis centers as a prime target to increase their union membership. Defendants' playbook remained unchanged: file a punishing initiative and offer to withdraw it in exchange for valuable consideration, thereby committing a felony. On August 9, 2017, Benjamen Tracey, UHW employee, and Edward Howard submitted a letter

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

requesting a ballot title and summary for Initiative No. 17-0014, naming it "The Fair Pricing for Dialysis Act."

96. The proposed measure, which would eventually become known as Proposition 8, "Limits on Dialysis Clinics' Revenue and Required Refunds Initiative," effectively prohibited kidney dialysis clinics from charging more than 15% over the costs for patient care and quality improvement and imposed burdensome reporting requirements and penalties for noncompliance.

97. Proposition 8 established a new front in the conflict between UHW and Regan and California's two largest dialysis businesses, DaVita Inc. ("DaVita"), based in Denver, Colorado, and Fresenius Medical Care ("Fresenius"), based in Waltham, Massachusetts. In light of UHW's attempts to unionize workers at dialysis clinics since 2016, the industry saw the initiative for what it was: a shakedown. For instance, Kent Thiry, CEO of DaVita, reportedly said that "Proposition 8 puts California patients at risk in an effort to force unionization of employees." Kathy Fairbanks, an opposition spokesperson, similarly stated, "[Sponsors] want to bring the dialysis community to the table and unionize it. This is just leverage."

98. UHW and Regan denied a link between Proposition 8 and their labor goals, but their words and actions told a different story. In a Los Angeles Times article, dated August 9, 2017, Sean Wherley, a UHW spokesman, while claiming that dialysis workers "want these [initiative] reforms regardless of what happens with their union efforts," also stated, "[w]e see it as a two-pronged approach" and "[w]e want to be sure we have as many options available as possible." In a San Francisco Chronicle piece, dated September 9, 2018, UHW's Trossman stated about the measure that "[i]t's trying to achieve the same goal in a different way."

99. A Los Angeles Times article that was published on October 29, 2018—a little more than one week before the vote on Proposition 8—told a similar story about Regan. While Regan publicly denied qualifying Proposition 8 to strike a deal with the dialysis industry, the article reported that Regan traveled to DaVita's headquarters in Denver to meet with Thiry on the eve of the June deadline to withdraw Proposition 8. Assemblyman Adam Gray, who spent weeks trying to bring the two sides together in hopes of breaking a stalemate and finding common ground, acted as an intermediary. However, the negotiations were unsuccessful.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

100. Nearly every major newspaper in California published an editorial opposing the measure. Many called it out for what it was: an abuse of the ballot initiative as a means to extract a labor deal. For example, the San Francisco Chronicle described Proposition 8 "as an example of a special interest trying to obtain from the ballot box what it could not achieve through other processes." The Modesto Bee, in an editorial dated October 21, 2018, likewise took a dim view of UHW and the measure, stating: "Proposition 8 is one union's attempt to force two specific companies in a single industry segment – kidney dialysis – to hire more workers. It is unnecessarily elaborate, uses scare tactics and is unlikely to deliver what it promises. In fact, it's more likely Proposition 8 will make matters worse in areas where specialized care can be difficult to obtain."

101. In an October 21, 2018 interview with Cal Matters, Regan darkly threatened that, if Proposition 8 failed, he planned to press for new legislation in 2019 aimed at the dialysis industry, and may return to the ballot in 2020 with a new initiative. Regan stated, "[h]onestly we did not just do this as a one-off. We are committed to . . . workers over the long-term."

102. On November 6, 2018, Proposition 8 was overwhelmingly rejected by voters, with nearly 60% voting "no." Defendants organized the campaign committee in support of Proposition 8, with UHW and Union Affiliate A donating nearly all (94%) of the $18.94 million raised. DaVita and other opponents of the measure spent nearly $110 million to defeat it, which highlights the dizzying price that the dialysis centers had to pay for not giving in to extortion.

103. The day after Proposition 8 was resoundingly defeated, UHW and Regan ignored voters and announced plans to refile the initiative during the next ballot cycle.

104. As they promised, UHW and Regan tried again. On October 24, 2019, UHW employees Sarah Steck and Elliott Petty filed Initiative No. 19-0025, which they titled the "Protect the Lives of Dialysis Patients Act." Steck was and still is employed by UHW as an Organizational Development Director. Petty was employed by UHW as a lead organizer.

105. The measure, which came to be known as Proposition 23, "Dialysis Clinic Requirements Initiative," would have required chronic dialysis clinics to have a minimum of one licensed physician present at the clinic while patients are being treated. The Los Angeles Times

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

and other commentators criticized Proposition 23 as merely increasing clinics' spending on doctors without delivering a meaningful improvement in the quality of care. Erin Trish, associate director of the University of Southern California's Leonard D. Schaeffer Center for Health Policy & Economics, echoed those criticisms, stating: "There's no reasonable evidence that this would improve patient health . . . . It seems largely to be driven by retaliation by SEIU-United Healthcare Workers West, who are mad the dialysis facilities wouldn't let their workers unionize."

106. Major newspapers again denunciated UHW's exploitation of the initiative system. As succinctly stated in an editorial by The Orange County Register on August 6, 2020:

> So this isn't about Californians' well-being. The ballot measure wasn't created by dialysis patients upset by their healthcare options. Its backer is SEIU-UHW West, a healthcare workers' labor union that has not been successful in organizing employees in dialysis clinics. Its electoral plan is apparently to make the two companies that own most of the state's clinics spend so much money fighting ballot initiatives every two years that they have a hard time staying in business. That kind of chicanery makes a mockery of California's initiative system and of your time as a citizen and voter.

107. On November 3, 2020, more than 63% of voters rejected Proposition 23, an even larger margin of defeat than Proposition 8. UHW accounted for nearly all of $8.9 million spent in support of the measure; DaVita and other dialysis companies spent more than $104 million opposing it.

108. Realizing the financial toll their campaign was taking on the dialysis industry, UHW and Regan tripled down on their war of attrition. On August 24, 2021, Sean Fleming and Jonathan Everhart filed Initiative No. 20-0013, calling it "Protect the Lives of Dialysis Patients Act," which was the same title of the soundly-defeated Proposition 23. Both proponents of the initiative were and still are UHW employees. Fleming is a UHW Political Coordinator whose experience is in government affairs, labor organizing, and political strategy. As discussed above, Everhart is also a Coordinator.

109. The initiative, which became known as Proposition 29, "Dialysis Clinic Requirements Initiative," was similar to Proposition 23, requiring clinics to have at least one physician, nurse practitioner, or physician assistant—with at least six months of experience with end-stage renal disease care—onsite during patient treatments.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

110. In an interview with POLITICO published on November 19, 2021, Regan made no secret of his intention to grind the dialysis clinics down with the end goal of winning more members for UHW, stating: "We obviously are a health care union. Would we like to represent dialysis workers? Sure. . . . I fully expect the industry, once again, to spend enormous amounts of money to oppose positive and reasonable reforms." The article reported that Regan would not rule out trying the initiative in the future if his third attempt at extorting the dialysis clinics failed: "It's going to happen in 2022 . . . , but we'll deal with 2024 when we get there."

111. Again, major newspapers roundly denounced UHW and Regan's corruption of the initiative process in their quest to extort the dialysis industry while having zero regard for patient welfare. For instance, the San Francisco Chronicle, in a September 29, 2022 editorial, stated:

> [T]his bill is about political hardball, not patient health. Nearly 75% of licensed dialysis clinics in California are owned or operated by two for-profit companies: DaVita Inc. and Fresenius Medical Care. Proponents of Prop. 29 don't hide the fact that they see this measure as part of a strategy to unionize the facilities owned by these companies. Fighting a ballot measure like Prop. 29 is expensive. Sooner or later, it will be cheaper to meet the union at the bargaining table instead of in the political realm. But using the health of patients as a bargaining chip is unconscionable. . . . Voters should reject Prop. 29's cynical tactics in November — and as many times as they need to in the future.

The article also pointed to the independent, nonpartisan review by the Legislative Analyst's Office, which found that this measure would "increase each clinic's costs by several hundred thousand dollars annually on average," potentially forcing clinics to close and putting patient health at risk. The review also found that the clinics that can withstand the increased costs would likely pass them off onto taxpayers, as the vast majority of dialysis patients are on Medicare or Medi-Cal.

112. On November 8, 2022, voters, for the third time, overwhelmingly rejected UHW and Regan's abusive tactics, with more than 68% of voters saying "no." This time UHW was alone in funding the measure, donating all of the approximately $8 million in supporting contributions. The dialysis companies contributed more than $83 million in opposition.

113. All told, the dialysis industry spent a staggering $297 million defending itself against UHW and Regan's attacks, money that could have gone to improving patient care. UHW,

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

Regan, and Union Affiliate A wasted nearly $36 million in member dues and other union funds in advancing initiatives that had no realistic chance of approval in their cynical extortion campaign.

**3. CPCA and Community Health Centers**

114. In early 2022, while trying for the third time to strong-arm the dialysis industry, Defendants also hatched their plans to shake down CPCA and California CHCs. The target changed. The playbook did not. File an initiative designed to inflict immense pain and use it to shake down the CHCs, all while trampling on California's election laws. Unlike the dialysis centers, CHCs are all non-profits that provide primary care and other services in an outpatient clinic setting regardless of a person's ability to pay. By serving patients with no health insurance, limited financial means, or living in underserved geographic areas, these clinics provide a vulnerable segment of the population with preventive and essential medical care, with the goal of reducing more extreme and expensive medical interventions.

115. California CHCs served 6.7 million people in 2025, or approximately 1 in 6 Californians. Approximately 67% of these patients are Latino, Asian Pacific Islander, or Black. Sixty-seven percent (4.2 million) are enrolled in Medi-Cal, California's Medicaid program. That means 1 in 3 Medi-Cal enrollees were served by CHCs. More than half of California CHC patients are at or below the federal poverty level. Nearly 300,000 California CHC patients in 2025 experienced homelessness, and more than half a million were agricultural or migrant workers. In many rural areas of the state, CHCs are sometimes the only source of primary care. In short, CHCs serve California's most vulnerable patients.

116. Nearly all CHCs in California are federally qualified health centers ("FQHCs"). FQHCs already must adhere to stricter regulatory requirements compared to other clinics due to one of their primary sources of income, federal grants from the Health Resources and Services Administration ("HRSA") under Section 330 of the Public Health Service Act. 42 U.S.C. § 254b. When a clinic receives this funding, it agrees to specific financial, compliance, and reporting requirements meant to ensure that clinics operate efficiently and effectively. FQHCs also receive funding from Medicare and Medi-Cal and agree to additional oversight intended to ensure that

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

"costs are reasonable, necessary, and directly related to patient care." 42 C.F.R. § 413.9. FQHC "Look-Alikes" meet all of the eligibility requirements of an FQHC but do not receive HRSA grant funding.

117. To avoid the difficulties of organizing employees at individual CHCs and clinic sites, Defendants sought to exert top-down pressure on CPCA to organize the sector. Initially, the centerpiece of Defendants' campaign was the introduction of a series of proposed legislation to the California legislature that would be economically harmful to non-unionized CHCs.

118. For example, in February 2022, Union Affiliate A sponsored the introduction of SB 1014. That bill would provide supplemental funding to CHCs on the condition that they paid a $25 minimum wage and participated in a bona-fide labor-management cooperation committee ("LMCC"). LMCC was defined in such a way to benefit UHW over other unions. CPCA, through its advocacy arm, opposed the bill on grounds that, in the proposed form, it violated federal law and was unlikely to be approved by the federal government. Between February and August 2022, CPCA expended considerable resources to prevent the bill from passing. Discussions with UHW led to workforce investments for CHCs, including retention bonuses. SB 1014 passed various legislative committee votes but died in November 2022.

119. In February 2023, Union Affiliate A sponsored the introduction of SB 779, which would impose new annual data reporting requirements on CHCs. CPCA opposed this bill, unless amended, on grounds that the new reporting requirements were burdensome, duplicative, and overly broad. In October 2023, the governor signed SB 779 into law over the opposition of CPCA.

120. On February 20, 2025, Assembly Bill 1113, entitled "Federally qualified health centers: mission spend ratio" ("AB 1113"), was introduced in the State Assembly. Union Affiliate A was the sponsor of the proposed legislation, but UHW was the driving force behind it.

121. The final version of the bill required FQHCs and FQHC Look-Alikes to have an annual "spend ratio" of no less than 90% of the FQHC's revenues. In effect, the bill prohibited FQHCs from spending more than 10% of their funding on "non-patient" services, such as administrative and managerial expenses, fundraising expenses, and profits. The bill imposed reporting requirements and fines for noncompliance. The bill specifically exempted FQHCs that

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

participated in a bona fide LMCC from needing to meet the mission spend ratio requirement. In other words, the bill arbitrarily excluded CHCs that already had a collective bargaining agreement with SEIU locals, including UHW. CPCA spent over a year fighting to stop this misguided bill in the legislature, requiring the expenditure of significant resources in that effort.

122. Knowing that the legislature was unlikely to go along with their AB 1113, UHW and Regan then turned to their signature move—initiating a punitive ballot measure against CHCs to wield as a cudgel in labor negotiations. On July 15, 2025, UHW employees Sean Fleming and Shawna Brown filed Initiative No. 25-0008, also known as the "Clinic Funding Accountability and Transparency Act" ("Clinic Penalty Initiative"). As discussed above, Fleming is a UHW Political Coordinator. Brown is also a UHW Coordinator.

123. Similar to AB 1113, the Clinic Penalty Initiative requires that each CHC report a "Spend Ratio," which is calculated as the "total amount spent on activities that accomplish each clinic's exempt purposes divided by that clinic's total revenue" as reported on its Internal Revenue Service Form 990. If a CHC does not meet an arbitrary 90% threshold on the Spend Ratio, then the CHC is required to pay a penalty to the state equal to the amount that constitutes the difference between the CHC's expenses and the amount that the CHC would need to spend to meet the 90% threshold. The initiative would require the CHCs to submit a registration fee to fund the new law and subject CHC leadership and board members to criminal penalties and jail time.

124. With the Clinic Penalty Initiative (now, Proposition 44), Regan and UHW boldly proclaimed that they had no qualms about putting patient care at risk in their quest to extort CPCA and CHCs. Simply put, it is a dangerous measure that will likely result in far-reaching cutbacks in services for the most vulnerable and needy populations in California. It would divert $1.7 billion away from patient care into new state bureaucracy in the first year alone, forcing CHCs to drastically reduce patient services and even close. The initiative would also cost the state more than $1 billion in additional healthcare spending and would limit expansions and upgrades of health centers and clinics across the state.

125. A study of the measure by consulting firm Berkeley Research Group ("BRG") showed that this initiative would result in 88% of the clinics evaluated operating at a loss, putting

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

those clinics at risk of closure and jeopardizing care for up to 11.7 million patient visits each year. Findings from the BRG report include:

- Most of the clinic organizations (91% or 183 of 202) analyzed do not meet the initiative's arbitrary 90% spend ratio requirement.
- Those organizations could pay $1.7 billion in total penalties in the first year alone—money from the clinics that would be redirected from patient and mission related expenses into a state penalty fund. Clinics would face similarly crippling penalties every year.
- Many of the organizations (64% or 117 out of 183) will have a resulting total negative margin if they are required to pay the penalty—putting clinics at risk of closure.
- Organizations at risk of closing were associated with between 1.3 million and 11.7 million patient encounters in 2023—including up to 7.7 million encounters from Medi-Cal patients.
- The strict 90% ratio would not allow clinics to keep funding in reserves for major capital investments, such as opening new clinics, purchasing new equipment or technologies, investing into value-based care, and preparing for potential public health or other emergencies.
- The initiative will increase State General Fund costs by more than $1 billion, primarily because displaced patients will be forced to receive care in more costly settings, such as hospital emergency rooms.

126. On September 22, 2025, a nonpartisan analysis by the Legislative Analyst's Office echoed these concerns about the Clinic Penalty Initiative, concluding: "[C]linics might close if they cannot sufficiently adjust to the measure's requirements, which could shift patients to publicly operated safety net providers and increase state and local costs. The net effect on state and local governments of these potential changes is uncertain, and could range from limited to extensive."

127. In a The Business Journal article, dated August 12, 2025, CHC leaders condemned the initiative as a "'reckless ballot measure' that would lead to more harm to the poor, the uninsured, the LGBTQ+ community, immigrants and working families," explaining:

> This is a ballot measure that could force some of the FQHCs to close or shut down clinics due to extra administrative costs. Shame on UHW for political gain to sacrifice and put the communities that are most vulnerable at risk with this initiative.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

128. In a Fresnoland article, dated August 13, 2025, another CHC leader spelled out the real-world consequences of the initiative:

> We pick up our patients to and from their house to the clinic at no cost. This would not be considered part of the mission service. We hire Zumba instructors to try and target obesity. We work with farmworkers and dairy workers — lechería — by providing health and blood screenings and education . . . all of which would be decimated by the initiative.

The leader questioned the authenticity of UHW's intentions with the current ballot measure, calling it a tactic to "gain political clout" and "increase their members, at the end of the day."

129. Yet, Defendants have continued to push this reckless ballot measure in the hopes that CPCA and CHCs will accede to their demands. On October 10, 2025, UHW issued a press release in support of the initiative, posting on its Instagram account: "The Clinic Funding Accountability and Transparency Act has received an official title and summary from the Office of the California Attorney General. That means we are ready to start collecting signatures to qualify it for the November 2026 elections."

130. On October 8, 2025, the initiative was cleared for signature gathering. On November 11, 2025, UHW issued a press release announcing that the Clinic Penalty Initiative had reached 25% of the signatures required to qualify for the November 2026 ballot. UHW also posted on its Instagram account: "We've collected 25% of the signatures required for the Clinic Funding Accountability initiative to qualify for the November 2026 ballot!" On November 12, 2025, the Secretary of State reported the campaign had collected at least 25% of signatures required based on certifications filed by Fleming and Brown.

131. Having passed the 25% signature threshold, the table was set for Defendants to heed the manual's call to break the law. On January 10, 2026, a senior California legislative staffer, conveying the position of Defendants, transmitted via e-mail to CPCA a written proposal styled a "Code of Conduct," presenting it as a joint submission of UHW, Union Affiliate A, and an SEIU International local union based in California ("Union Affiliate B" and, together with Union Affiliate A, "Union Affiliates"). The proposal set out the terms of a union "Election Procedure Agreement" that included a requirement that CHCs hold elections for at least 5,000 employees in each of five years the agreement would be in effect, resulting in elections for 25,000

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

employees over the five-year period. Defendants demanded this agreement be signed by CPCA and adopted by CHCs.

132. That e-mail also disclosed the consideration Defendants would supply in exchange, stating:

> **Please know as part of this discussion, SEIU has agreed . . . that an agreement on election procedures will result in their dropping . . . the clinic-focused initiative that SEIU-UHW has introduced.**

133. This e-mail sets forth Defendants' scheme of extortion and bribery with remarkable clarity and candor: if CPCA and its members signed the Election Procedure Agreement, Defendants would drop the Clinic Penalty Initiative. Defendants' offer of a quid pro quo squarely violated California's criminal prohibition on corrupting the ballot initiative process, as set forth in California Elections Code §§ 18620–18621. Even more troubling, Defendants communicated their proposal through channels intended to maximize the coercive pressure on CPCA and CHCs to acquiesce to the demand.

134. The e-mail also demonstrates that UHW and the Union Affiliates reached a meeting of the minds to leverage and abuse the ballot initiative process to unlawfully coerce labor concessions from CPCA and CHCs through extortion and bribery. For example, the subject line expressly identifies the Election Procedure Agreement as coming "from [Union Affiliate A], SEIU-UHW, and [Union Affiliate B]." Similarly, the first line of the body of the e-mail states that "this is a proposal from SEIU." Regan's communications with CPCA—and subsequent news reports—made it clear that Regan was the ringleader of this effort and that the e-mail would not have been sent without his knowledge, urging, input and approval. Underscoring the coordination and understanding between and among UHW and the Union Affiliates is the remark that "SEIU has agreed . . . that an agreement on election procedures will result in their dropping . . . the clinic-focused initiative that SEIU-UHW has introduced." The e-mail unambiguously shows that UHW and the Union Affiliates—bullied and instructed by Regan—agreed and intended to participate in an endeavor to abuse the ballot initiative process to extract valuable labor concessions from CPCA and CHCs, in violation of federal and state law.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

135. Regan was also party to the agreement by and among UHW and the Union Affiliates to solicit a signed Election Procedure Agreement from CPCA and CHCs in exchange for withdrawing or abandoning the Clinic Penalty Initiative. Based on first-hand communications between Regan and CPCA's representatives, and by virtue of Regan's leadership positions with UHW, SEIU International and Union Affiliate A, Regan instructed, facilitated, sponsored, and supported the filing of the Clinic Penalty Initiative, had the authority to cause or require the initiative's proponents (both of whom are UHW employees) to withdraw or abandon the initiative, participated in the drafting or creation of the Election Procedure Agreement, coordinated the actions of UHW and held meetings and discussions with representatives of the Union Affiliates regarding the execution and implementation of the quid pro quo scheme, and authorized the decision to communicate the offer through the staff of elected officials.

136. In reality, the proposed Election Procedure Agreement attached to the e-mail was a so-called "neutrality" agreement between UHW and Union Affiliate B, on the one hand (referred to in the draft as the "Union"), and CPCA and each signatory CHC, on the other (referred to in the draft as the "Employer Parties"). Ex. 1, 1/9/2026 Election Procedure Agreement. The Election Procedure Agreement had a proposed term of five years from the date the last signatory CHC executed the agreement. *Id*. at § A.3. It required elections for at least 5,000 employees per year, totaling elections for 25,000 employees over the proposed agreement's five-year term. *Id*. With average UHW dues of approximately $94.82 per employee per month as reported in UHW's 2023 LM-2 filings, UHW could gain approximately $2.37 million in new monthly dues revenue from CHCs.

137. Although Defendants claim that the procedures in the proposal were intended to provide employees freedom of choice regarding unionization, the agreement was designed to result in UHW and Union Affiliate B—and UHW and Union Affiliate B ***only***—being the bargaining representatives for CHCs. The Election Procedure Agreement provided for an election that culminated in a single ballot election with one question: "Do you wish to be represented by [UHW or [Union Affiliate B]] for the purposes of collective bargaining with [Name of Health Center]?" *Id*. at § E.8.d. The proposal barred the Employer Parties from soliciting any "rival

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

union(s)" to intervene in the election, but allowed the union parties to dissolve the agreement if a rival union intervened. *Id*. at § E.5.

138. The Election Procedure Agreement required CPCA and CHCs to recognize UHW or Union Affiliate B as the collective bargaining agent on behalf of employees where a majority of voting employees, vote for union representation, and to immediately commence good faith negotiation for a collective bargaining agreement. *Id*. at § E.8.g.

139. The proposed Election Procedure Agreement imposed a strict gag order on CPCA and signatory CHCs regarding the subject of unionization:

- The Employer Parties' representatives will not inform or imply to eligible voters that they will lose benefits, wages or be subject to less favorable working conditions by unionizing.
- The Employer Parties agree that they will not imply that the Union will force employees to strike, fine employees, or discuss union dues in any manner.
- The Employer Parties agree that its supervisors and managers shall not initiate one on one conversations with employees about unionization.
- The Employer Parties agree that employee participation in any meeting where unionization is to be discussed shall be voluntary. The Employer Parties agree to give forty-eight (48) hours' notice to employees that they will be holding a meeting where unionization will be discussed and will inform employees that the meetings are completely voluntary. The Employer Parties also agree to invite a representative of the Union to address the group as well. The Employer Parties agree not to take any attendance of those who attend such a meeting, and they agree not to prohibit any employee from attending.
- The Employer Parties agree that they will not use any consultants, outside parties, or other individuals with respect to unionization or any election conducted under this Agreement. The Employer Parties agree not to use surrogates to avoid their obligations under this Agreement.
- The Parties agree that they will not use any funds, regardless of their source, to influence or interfere with employees with respect to unionization.
- Permitted Message: Should the Employer Parties wish to convey an opinion to employees about unionization, the Employer Parties agree that their message on this subject, if any, will be as follows: The [Health Center] strives to act in the best interest of its employees and prefers a direct relationship between employer and employee. The [Health Center] is also committed to the principle that employees must be free to choose in a secret ballot election whether or not to join a union. The [Health Center] will not ask or tell employees to vote against union representation. The [Health Center] may provide employees with information to support an informed choice. Information presented to employees

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

> about unions will be accurate and factual and will be provided to employees for the purpose of encouraging full discourse and reflection.

*Id*. at § C.3–10.

140. Through the proposed Election Procedure Agreement, Defendants sought to obtain money and property from CPCA and CHCs as well as control over aspects of their business operations by:

- Requiring a CHC, upon receipt of the notice of intent to organize, to distribute to employees a statement of employee rights that, among other things, allowed employees to distribute pro-union literature while on CHC property and to discuss unionization during working hours.
- Requiring CHCs to appoint an on-site coordinator to address any issues that may arise during an election period and to grant UHW's on-site coordinator access to CHC property.
- Requiring CHCs to provide UHW organizers with access to CHC facilities, including non-public areas such as breakrooms and conference rooms.
- Barring CHCs from attending meetings between union organizer and eligible voters that take place on CHC property.
- Requiring CHCs to provide bulletin board space to organizers.
- Requiring CHCs to grant an unpaid leave of absence for up to four months for one employee within each bargaining unit at the facility being organized, and to allow that employee to return to their position at the conclusion of their leave.
- Requiring CHCs to pay for half the costs of an election officer and holding the election.
- Requiring CHCs to permit employees to vote for unionization during working hours.
- Barring CHCs from using supervisors as election observers.
- Requiring CHCs to provide a list of the names, home addresses, telephone numbers, including cell phones, e-mail addresses, job title/department and shift of the employees in the unit UHW are seeking to organize.

*Id*. at §§ D.3–4, E.7.c–e, E.2. E.8.a, e.

141. On April 1, 2026, UHW announced that it had delivered the necessary signatures to qualify the Clinic Penalty Initiative for the November 2026 ballot. UHW claimed publicly that it had collected over one million petition signatures, very likely enough to surpass the validation process to qualify the initiative for the ballot.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

142. The Clinic Penalty Initiative is essential to Defendants' plans to extort Plaintiffs because Defendants have since abandoned AB 1113. In a meeting with CPCA on or around April 30, 2026, that involved Regan and other representatives from the Union Affiliates and legislative staff, Defendants reiterated and reemphasized UHW's extortionate labor demands. In no uncertain terms, Regan again asserted that any negotiations between the parties must include CPCA's guarantee that at least 25,000 CHC employees would be subject to unionization through the Election Procedure Agreement. With the submission of signatures by UHW just weeks earlier, Regan directly raised the specter of the initiative qualifying for the ballot as a leverage point. He repeatedly warned that CPCA was on a "collision course" and would not be able to avoid it come June 25, 2026, which is the final date before the Secretary of State would officially certify the Clinic Penalty Initiative for the November ballot. Regan asserted that CPCA would need to compromise over the Election Procedure Agreement by that date to avoid the "collision course" that UHW had commenced with the filing of petition signatures.

143. Disturbing details about Regan's unhinged conduct following the April 30, 2026 meeting have since emerged. In a September 11, 2026 article, the Los Angeles Times reported that, after the meeting with CPCA, Regan "physically and verbally intimidated" a woman of color who works for Union Affiliate B because Regan was upset with the president of Union Affiliate B.

144. On May 16, 2026, the senior California legislative staffer that previously sent the January 10, 2026 e-mail, sent a text message to CPCA's Vice President of Government Affairs, passing along a threat from UHW that "they're considering legislation" as additional leverage against CPCA and CHCs. The legislative staffer warned CPCA that "w[e] need to get this agreement done" and that "it's getting to the time where we don't have time." In other words, the deadline to withdraw the initiative was drawing near and CPCA needed to cave to UHW and Regan's demands before it was too late. The legislative staffer also described the possibility that UHW would dangle withdrawing the UHW-sponsored billionaire tax measure ("California One-Time Wealth Tax for State-Funded Health Care Programs Initiative," Initiative No. 25-0024) in exchange for the Newsom Administration's support of the Clinic Penalty Initiative.

145. In a June 8, 2026 call, Regan told a CPCA board member that CPCA needed to accept the neutrality agreement or be subject to either the Clinic Penalty Initiative or punitive legislation.

146. In the weeks leading up to the June 25, 2026 deadline to withdraw ballot measures from the November ballot, CPCA and UHW engaged in intensive negotiations over the Clinic Penalty Initiative. According to a detailed account published by POLITICO on July 21, 2026, CPCA's CEO recounted that, before Regan had even begun the process of putting the measure to voters, Regan offered to abort his plans if the clinics would stand aside to allow his union to sign up 25,000 clinic staffers as new union members. Faced with the prospect of a ballot measure that clinics feared would devastate their ranks, the offer landed as a thinly-veiled threat. As CPCA's CEO stated: "It's no secret in this town that UHW has weaponized the ballot initiative process, and not to really fix policy, but to leverage for something else."

147. A person close to the negotiations, who requested anonymity to discuss the private talks candidly, corroborated CPCA's account, confirming that the push to increase UHW's membership had been a main component of the discussions. The anonymous source also corroborated CPCA's claim that the union and clinics had been close to a deal to keep the measure off the ballot, but that it fell apart in the final days before the state deadline.

148. During these negotiations, CPCA and UHW had hammered out a tentative deal under which CPCA would distribute a Regan-approved employment agreement template to its members for voluntary use as a resource at clinics where staff sought to unionize. In exchange, UHW would withdraw the Clinic Penalty Initiative and agree not to propose, sponsor, finance, qualify, or publicly support any ballot measure hostile to the clinics through the end of 2030, and would further agree not to sponsor, seek to introduce, or publicly support adverse legislation. Approximately 95% of the terms had been agreed upon. However, on the day before the June 25, 2026 deadline, Regan's team issued an eleventh-hour demand that clinics be required to use the model employment agreement, rather than it being voluntary. As a trade association whose approximately 200 members are independently operated by their own boards, CPCA did not have the authority to impose such a binding obligation on its members and the deal collapsed.



BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

149. Notably, in the same POLITICO article, Regan denied that the Clinic Penalty Initiative was linked to UHW's organizing demands, claiming that any notion the two issues were connected was "all their own concoction." Regan also claimed that he never offered a deal to forgo his plans for the ballot measure in exchange for clinics' cooperation on organizing staff, and asserted that it was the clinics, not him, that made a last-minute bid to keep the measure off the ballot by offering a five-year union enrollment campaign. Regan characterized the Election Procedure Agreement as "a symbolic proposal without any practical effect" and dismissed the notion that the parties had been close to a deal, stating: "And that is not a close disagreement, that is a Grand Canyon sort of disagreement."

150. Regan's denials are squarely contradicted by the allegations set forth herein. First, the January 10, 2026 e-mail from a senior California legislative staffer—transmitting the Election Procedure Agreement on behalf of UHW and the Union Affiliates—expressly conditioned the withdrawal of the Clinic Penalty Initiative on CPCA's execution of the Election Procedure Agreement, demonstrating that it was Defendants, not the clinics, who proposed the quid pro quo. Second, the Election Procedure Agreement itself was drafted and transmitted by Defendants, not by CPCA, further refuting Regan's claim that the clinics initiated the five-year organizing proposal. Third, at the April 30, 2026 meeting, Regan personally demanded that CPCA guarantee 25,000 CHC employees would be subject to unionization through the Election Procedure Agreement and warned of a "collision course" tied to the initiative's qualification deadline—directly linking the ballot measure to his organizing demands. Fourth, on May 16, 2026, the same legislative staffer passed along UHW's threat that "they're considering legislation" as additional leverage and warned CPCA that "w[e] need to get this agreement done" and that "it's getting to the time where we don't have time"—again confirming that withdrawal of the initiative was conditioned on CPCA's capitulation to Defendants' labor demands. Fifth, on June 8, 2026, Regan himself told a CPCA board member that CPCA needed to accept the neutrality agreement or be subject to either the Clinic Penalty Initiative or punitive legislation. These communications, spanning from January through June 2026, establish an unbroken chain of events indicating that

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

Defendants—not the clinics—initiated, proposed, and repeatedly pressed the quid pro quo linking the Clinic Penalty Initiative to their organizing demands.

151. Also on June 24, 2026, UHW's chief lobbyist, Gustavo Medina, proposed a completely separate arrangement: UHW would withdraw the Clinic Penalty Initiative if, in exchange, CPCA reversed its opposition to UHW's billionaires' wealth tax initiative and took the funds it raised to oppose the Clinic Penalty Initiative and instead used that money to assist UHW in passing its wealth tax. The next morning, Regan, through an intermediary, offered the same "deal." CPCA refused to entertain such discussions.

152. On June 25, 2026, the Secretary of State issued a "certificate of qualification" for the Clinic Penalty Initiative to be placed on the November election ballot as Proposition 44.

153. As election day draws closer, major news outlets have continued with their withering criticism of Proposition 44, highlighting Regan and UHW's cynical and dangerous warping of California initiative process. For example, on August 28, 2026, the San Diego Union-Tribune denounced UHW's attempt to shake down CHCs as "blackmail," explaining:

> Over the past decade, . . . the Service Employees International Union-United Healthcare Workers West (SEIU-UHW) has pioneered perhaps the most obnoxious use yet of the initiative process: using it to smear whole wings of the health care industry as dangerously incompetent and in need of government microregulation. . . . SEIU-UHW is back at it this election with Proposition 44, which makes the same false claims about the alleged shortcomings of hundreds of nonprofit community health clinics - used by millions of Californians - as the union did about dialysis clinics. It does so for the same reason: to force the clinics - those run by San Ysidro Health are prominent local examples - to let the union organize their workers.

154. On September 8, 2026, the Orange County Register similarly exhorted voters not to fall for UHW's "thuggish tactics," stating:

> Passage of Prop. 44 would be an outcome that serves no one. But as with the dialysis measures of past years, passing Prop. 44 isn't really the goal. . . . Given their history, no one should give Regan or SEIU-UHW the benefit of the doubt. It's evident what SEIU-UHW wants – more members, more dues, more power – and that it's willing to threaten the healthcare of Californians across the state in pursuit of those ends.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

**E. Defendants Are Attempting or Seeking to Obtain the Property of CPCA and CHCs and Other Things of Value Through Corruption of California's Ballot Initiative Process**

155. At all times relevant, the illegal tactics described herein were done by Defendants, and continue to be done, with the specific intent to obtain for themselves and for their benefit the property of CPCA and CHCs and other things of value described herein.

156. The mechanism through which Defendants seek to obtain, and thereby exercise control over, CPCA and CHCs' property and other things of value is unambiguous. Should Defendants' campaign of extortion and bribery succeed and CPCA and CHCs succumb to Defendants' pressure, CPCA and CHCs would be subject to a series of contractual obligations pursuant to the Election Procedure Agreement, which would subsequently result in the transfer of CPCA and CHCs' money, property and business autonomy to the Defendants or to a third-party (e.g., unionized CHC employees).

157. All of the money, property or other things of value demanded by Defendants constitutes something of value which can be used, exercised, transferred or sold under well-settled principles of property, commercial and contract law. Specifically, the money, property or other things of value demanded by Defendants are either: (1) money, or another tangible item, or (2) a right or legal interest in property that is intangible, but of a type which is commonly bought or sold in exchange for money, licensed, assigned, or otherwise capable of being transferred.

**1. Money**

158. Defendants are attempting to obtain, through extortion, substantial sums of money from CPCA and CHCs directly, including union dues, increased wages for represented workers, contributions to pension funds, payment of health plan fees and other coverage costs, training funds, and the contribution of funds to support Plaintiffs' efforts to pass their billionaires' wealth tax (i.e., Proposition 40). These compelled financial transfers constitute classic forms of property that Defendants seek to obtain for their own benefit or the benefit of unionized CHC workers.

159. As a result of the Election Procedure Agreement, CPCA and CHCs will also be obligated to make payments for the benefit of and at the direction of Defendants with respect to the election procedure outlined in the Election Procedure Agreement. In particular, pursuant to

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

the Election Procedure Agreement, the parties will be required to select a "permanent Election Officer," the cost of which would "be split equally" between the Defendants and Plaintiffs. Ex. 1, 1/9/2026 Election Procedure Agreement at § E.2. Similarly, pursuant to the Election Procedure Agreement "any costs associated with the election will be borne equally" between the Defendants and Plaintiffs. *Id.* at § E.4. These compelled expenditures constitute additional financial property that Defendants seek to obtain or otherwise control through coercive means in order to advance their own objectives and strategic purpose of unionizing the workforce of CHCs. This is property that Defendants can use, exercise, transfer or sell.

**2. Access and Control Over Property**

160. Execution of the Election Procedure Agreement would obligate CPCA and CHCs to confer significant, concrete benefits upon Defendants, including but not limited to access to CHC facilities, employees, and confidential business information (including personal and private employee information), and ultimately the use of CHC resources to facilitate Defendants' organizing efforts.

161. In particular, the Election Procedure Agreement demanded by Defendants requires that CHCs allow "UHW . . . organizers . . . access to the break rooms and to the public areas inside and outside [its] facility[ies]," *id.* at § E.7.b, allow UHW access to bulletin boards on CHC property, *id.* at § E.7.c, and allow UHW access to "reserve facility conference rooms" at locations where an interest in unionization has been shown, *id.* at § E.7.d. These compelled access rights constitute a transfer of CHCs' possessory and exclusionary interests in their own property.

162. The Election Procedure Agreement further requires CHCs to surrender proprietary employee information by mandating that CHCs "provide UHW . . . with a list of the names, home addresses, telephone numbers, including cell phones, e-mail addresses, job title/department and shift of the employees in [a] proposed unit UHW . . . seek[] to organize." *Id.* at E.8.a. This information is confidential, valuable, and would not otherwise be available to Defendants absent CHCs' coerced disclosure.

163. These compelled transfers of access rights, confidential information, and operational resources constitute property interests that Defendants can use, exploit, or leverage for their own benefit.

**3. Control Over Plaintiffs' Business Autonomy**

164. Defendants' scheme of extortion and bribery also seeks to obtain another distinct form of Plaintiffs' property or thing of value: Plaintiffs' business autonomy. By coercing Plaintiffs into executing the demanded Election Procedure Agreement, Defendants aim to appropriate decision-making authority that is central to Plaintiffs' ability to manage, direct, and control their own operations. The Election Procedure Agreement would impose mandatory constraints on Plaintiffs' managerial discretion, labor-relations strategy, communication with employees, and day-to-day operational governance.

165. For example, the Election Procedure Agreement would require Plaintiffs to relinquish their longstanding right to communicate freely with their own employees or members regarding unionization. By mandating strict limitations on what Plaintiffs may say to their own employees and members, the Election Procedure Agreement transfers to Defendants a significant measure of Plaintiffs' managerial authority and expressive autonomy. These compelled restrictions operate as a direct intrusion into Plaintiffs' ability to convey their views, provide information, or respond to employee or member inquiries concerning union representation—functions that are integral to Plaintiffs' control over their workforce and business operations. For example, the Election Procedure Agreement explicitly governs and constrains what Plaintiffs' communications with employees may be:

> Permitted Message: Should the Employer Parties wish to convey an opinion to employees about unionization, the Employer Parties agree that their message on this subject, if any, will be as follows: The [Health Center] strives to act in the best interest of its employees and prefers a direct relationship between employer and employee. The [Health Center] is also committed to the principle that employees must be free to choose in a secret ballot election whether or not to join a union. The [Health Center] will not ask or tell employees to vote against union representation. The [Health Center] may provide employees with information to support an informed choice. Information presented to employees about unions will be accurate and factual and will be provided to employees for the purpose of encouraging full discourse and reflection.



BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

*Id*. at § C.10.

166. By way of another example, under the Election Procedure Agreement, Plaintiffs would also be obligated to "grant an unpaid leave of absence for up to four (4) months to one (1) employee within each bargaining unit at the facility being organized." *Id*. at § E.7.e. Such business decisions are mandatory under the Election Procedure Agreement and wholly out of Plaintiffs' control and instead at the direction of Defendants pursuant to the Election Procedure Agreement.

167. These forms of business autonomy, managerial authority, and operational control are valuable property interests that Defendants seek to obtain and exercise for their own benefit and are rights that can be used, exercised, transferred, or bargained away.

**F. Defendants' Conduct Caused Injury to Plaintiffs**

168. As a result of Defendants' extortionate campaign, Plaintiffs have incurred, and continue to incur, damages as a direct and proximate result of Defendants' extortionate scheme. Defendants have frustrated CPCA's core mission by forcing CPCA to expend significant time, money, and resources to respond to and avoid the harm threatened by Defendants' extortionate demands that CPCA would not have otherwise expended but for, and as a direct result of, Defendants' extortionate acts. CPCA and its member CHCs have had to bear millions of dollars in costs responding to Defendants' extortionate efforts, including: hiring consultants, experts, and attorneys to evaluate Defendants' demands and the costs of acquiescence and non-acquiescence to those demands and the threatened actions accompanying them; reviewing and analyzing the Election Procedure Agreement and its financial and operational implications for CPCA and its member CHCs; conducting polling and research to assess the impact and plausibility of Defendants' campaign; engaging in public relations and marketing efforts to counteract Defendants' pressure tactics; establishing campaign committees to respond to Defendants' deployment of the initiative process in service of their extortion; hiring enhanced security and increasing staff hours to deal with Defendants' disruption and threats at CPCA events; and dedicating substantial staff time to educating members, preparing materials, convening meetings, and engaging in negotiations with Defendants regarding their demands.

169. Given the limited staff and resources at CPCA's disposal, the diversion of these

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

funds and resources in response to Defendants' extortionate scheme has directly interfered with and impaired CPCA's ability to carry out its core mission of serving CHC members through providing training and educational programs, delivering operational, financial, and clinical support resources, and other non-advocacy services.

170. CHC Plaintiffs have likewise suffered substantial injury as a direct and proximate result of Defendants' extortionate scheme. As CHC members of CPCA and targets of Defendants' campaign, CHC Plaintiffs have been forced to divert significant staff time, financial resources, and operational capacity away from patient care and core mission activities in order to respond to the threats posed by Defendants' extortionate acts. These injuries include, but are not limited to: expenditures on legal counsel, consultants, and advisors to oppose and evaluate Defendants' demands and the costs of acquiescence and non-acquiescence to those demands and the threatened actions accompanying them; costs associated with analyzing the potential impact of Defendants' coercive campaign on their operations and financial viability, including preparing for possible compliance with the initiative's arbitrary spending ratio requirements; diversion of executive and administrative resources from patient services to respond to Defendants' extortionate scheme, thereby impairing their ability to accomplish their mission; and expenditures on enhanced security measures and staff time necessitated by Defendants' scheme-related onsite campaigns targeting CHC leaders and patient board members.

171. For example, Plaintiff Shasta Community has incurred more than $300,000 in expenses it would not have otherwise incurred but for Defendants' extortionate scheme, including direct financial expenditures necessitated by Defendants' coercive campaign and on social media outreach to inform community members of the threats posed by Defendants' conduct. Shasta Community has also been forced to divert substantial staff time and operational resources away from patient care, including: redirecting patient education staff from their core responsibilities to formulating strategies to defend the health center from Defendants' extortionate demands; reassigning communications team members from patient care and quality improvement communications to defensive messaging in response to Defendants' campaign of extortion and bribery; deploying security personnel to enforce private property rights and address union

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

organizers trespassing on health center property; diverting the chief financial officer's time to assessing the potential financial impact of the initiative's 90% spending ratio threshold and coordinating with CPCA and other health center financial officers to analyze the initiative's consequences; dedicating finance team resources to evaluating expenditure classifications under the initiative's requirements; consuming the chief executive officer's time in research, content creation, internal and external communications, responding to employee and partner concerns, and addressing personal attacks on health center leadership as part of Defendants' pressure campaign; devoting extensive board meeting time to addressing the threat posed by the initiative; and redirecting the director of compliance's time to preparing tax and legal documents demanded by union representatives as part of Defendants' pressure campaign.

172. Plaintiff San Ysidro Health has contributed approximately $1 million to efforts responding to Defendants' extortion-related threats—funds that would otherwise have been directed to patient care and mission-related services for the medically underserved communities that San Ysidro Health serves, thereby impairing its ability to accomplish its mission.

173. San Ysidro Health has suffered additional injury as a result of Defendants' extortionate scheme, compromising its ability to replace a clinic it has operated for over fifty years on San Diego County property, which serves approximately 12,000 unique patients annually. In 2024, the County declared the property a surplus asset due to the facility's age and issued a Request for Proposals soliciting housing developers to develop the site for low-income housing, on the condition that any winning proposal include replacement of the clinic. San Ysidro Health was included in the bid of the housing provider that was ultimately awarded the property, with a budget of $48 million for a replacement clinic and parking garage. Historically, San Ysidro Health has financed these new clinics through conventional bank financing. However, as a result of Defendants' deployment of Proposition 44 as an instrument of extortion, San Ysidro Health's lenders have tightened lending requirements over concerns regarding Proposition 44's impact on San Ysidro Health's ability to repay the debt. As a result, San Ysidro Health has been forced to scale back the project significantly, reducing clinical space by over 20% and eliminating the parking garage entirely. The reduced-scope budget of $36 million will now require a development

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

partner to provide financing, whose fees and project management costs will consume resources that would otherwise support patient care. San Ysidro Health's Board of Directors is now considering withdrawing from the project altogether—depriving an underserved community of a critical healthcare resource for years to come, while also compromising the delivery of much-needed low-income housing units.

174. Plaintiff Hill Country has contributed approximately $65,000 to support CPCA's coordinated statewide response to Defendants' threats, which represents a substantial, out-of-pocket expense that would not have been incurred absent Defendants' extortionate campaign. Significant executive leadership time has been devoted to evaluating Defendants' demands, researching and evaluating the legislative measure and its implications, and developing educational materials for its board of directors, employees, and patients. These activities diverted leadership and staff time away from strategic initiatives, operational improvement, workforce development, quality initiatives, and patient care. As a rural FQHC operating with limited financial margins, these diverted resources have real consequences because every dollar and hour devoted to responding to Defendants' scheme is a dollar and an hour unavailable for expanding patient access, recruiting providers, investing in workforce development, strengthening technology infrastructure, or improving the quality of care.

175. Likewise, Mountain Valleys and Shasta Cascade also contributed extra funds to the campaign in response to Defendants' extortionate campaign, funds that would have been used for patient care and other mission-related activities, thereby impairing their ability to accomplish their mission.

**FIRST CAUSE OF ACTION**
**RICO Enterprise**
**18 U.S.C. § 1962(c)**
**Against all Defendants**

176. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

177. Plaintiffs are RICO "persons" as defined by 18 U.S.C. §§ 1961(3) and 1964(c).

178. Each Defendant is a RICO "person" as defined by 18 U.S.C. §§ 1961(3) and 1962(c).

179. Defendants UHW, Regan and the Union Affiliates constitute an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). More specifically, the enterprise is an association-in-fact that operates for the common purpose of directing, facilitating, and benefiting from a pattern of racketeering activity, including but not limited to coercing unionization in the healthcare industry throughout the United States.

180. The enterprise has a common purpose, relationships among those associated with it, and longevity sufficient to permit the pursuit of its objectives. Defendants collectively coordinate their actions, share information, and operate through formal and informal channels within and outside the union's organizational structure to carry out the racketeering scheme. The enterprise functioned as a continuing unit, with each Defendant playing a role in planning, executing, concealing, or profiting from the unlawful conduct.

181. Each Defendant knowingly conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs. Regan directed and approved the strategy; Regan and UHW implemented that strategy through sponsoring, funding and coordinating the Clinic Penalty Initiative; and Defendants and the Union Affiliates played a distinct role in planning, executing, or benefitting from the scheme to obtain money, property, and other things of value from Plaintiffs in exchange for withdrawing the Clinic Penalty Initiative.

182. The enterprise is separate and distinct from the pattern of racketeering activity itself. While the racketeering acts furthered the enterprise's objectives, the enterprise existed before, during, and after the commission of those acts, and maintained an ongoing organizational framework, decision making structure, and division of labor among its participants.

183. The enterprise is engaged in, and its activities affect interstate commerce. SEIU International is a national labor organization with members, offices, and financial operations in numerous states, and it regularly transmits dues, fees, and other funds across state lines. UHW and the Union Affiliates receive funding, strategic direction, personnel, and resources from SEIU

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

International's national offices located outside California. Defendants routinely use interstate mail, e-mail, telephone, electronic communications, and travel to coordinate their activities, including communications among SEIU International's national headquarters, UHW, Regan, and the Union Affiliates.

184. The enterprise interacts with and exerts pressure on healthcare employers that operate in interstate commerce, including employers that purchase medical supplies, pharmaceuticals, equipment, and insurance from out of state vendors, and that provide services reimbursed by federal programs such as Medicare and Medicaid. The enterprise's organization of campaigns, financial operations, and deployment of personnel extend across state lines and directly affect the flow of goods, services, and money in interstate commerce.

185. Each Defendant was and is associated with the enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the enterprise in relation to Plaintiffs through a pattern of racketeering activity unlawful under 18 U.S.C. § 1961(1), namely, multiple, repeated and continuous acts or threats against Plaintiffs and other participants in California's healthcare industry involving conduct indictable or chargeable under 18 U.S.C. §§ 1951–1952, California Penal Code §§ 182, 518–520, and 524, and California Elections Code §§ 18620–18621.

186. The actions and events described in this complaint constitute acts or threats undertaken by Defendants with the specific intent to conspire and attempt to extort money, property, goodwill, and pecuniary benefit from Plaintiffs. Therefore, such acts and threats are separately chargeable as extortion under 18 U.S.C. § 1951 as well as 18 U.S.C. § 1952, California Penal Code §§ 182, 518–520, and 524, and California Elections Code §§ 18620–18621.

187. More specifically Defendants' conduct is unlawful in that, as the proponents of the Clinic Penalty Initiative, Defendants expressly offered to cease pursuing, advancing, or supporting the economically punitive initiative as consideration for Plaintiffs' capitulation to Defendants' demands for valuable labor concessions in the form of the Election Procedure Agreement or to contribute money to Plaintiffs' efforts to pass the billionaires' wealth tax initiative.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

188. Through these extortionate efforts, and using the threat of injury to the business of CPCA and CHCs, Defendants sought not merely to influence the conduct of CPCA and CHCs, but to obtain and exercise control over the property interests described above, including: (1) money in the form of union dues, increased wages for represented workers, contributions to pension funds, payment of health plan fees and other coverage costs and training funds, and contributions to Plaintiffs' efforts to pass the billionaires' wealth tax initiative; (2) access to real and business property, including confidential business information; and (3) business autonomy.

189. All of the property demanded by Defendants constitutes something of value which can be used, exercised, transferred, or sold under well-settled principles of property, commercial, and contract law. Specifically, the property demanded by Defendants is either (1) money, or another tangible item, or (2) a right or legal interest in property that is intangible, but of a type commonly bought or sold in exchange for money, licensed, assigned, or otherwise capable of being transferred.

190. Defendants have sought to obtain this tangible and intangible property, by inducing the consent of CPCA and CHCs through the unlawful and wrongful use of threats, fear, economic coercion, and corruption of the ballot initiative process. More specifically, Defendants sought to obtain this tangible and intangible property through conduct expressly prohibited by California Elections Code §§ 18620–18621. Defendants' quid pro quo demand, in violation of California Elections Code §§ 18620–18621, is also capable of being generically classified as bribery under California law.

191. Because Defendants' actions violated these statutory prohibitions, their conduct cannot be characterized as legitimate union activity or constitutionally protected free speech, but instead constitutes extortion, as the objective is to obtain through wrongful means property to which Defendants have no lawful claim, and bribery, as Defendants sought to corruptly influence a public action.

192. These acts and threats described herein constitute a pattern of racketeering activity as Defendants have engaged in at least two acts of racketeering activity, one of which occurred after the enactment of RICO and the last of which occurred within ten years after commission of

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

the prior act (18 U.S.C. § 1961(5)). This pattern of racketeering activity includes multiple and repeated acts of (1) attempted extortion and conspiracy to commit extortion indictable under federal law or chargeable under California law and punishable by imprisonment for more than one year and (2) attempted bribery and conspiracy to commit bribery chargeable under California law and punishable by imprisonment for more than one year.

193. The predicate acts described herein are related because they share a common purpose—coercing the target into surrendering money, property, and business rights for Defendants' financial benefit using wrongful threats and through corruption of California's ballot initiative process. They involve the same participants, the same methods of intimidation and economic coercion, and the same intended victim or victims. Defendants' tactics of extortion and bribery are part of an ongoing strategy used against multiple healthcare entities and are not isolated events, and, indeed, Defendants have threatened to undertake them again in the future. Absent judicial intervention, there is nothing to prevent Defendants from keeping their promises to continue employing this pattern against Plaintiffs, or similarly situated targets, in the future. Accordingly, the predicate acts satisfy both the relatedness and continuity requirements of 18 U.S.C. § 1961(5).

194. Plaintiffs' injuries were proximately caused by Defendants' conduct in operating and managing the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Defendants used their positions within, and their relationships to, the enterprise to direct, coordinate, and carry out extortionate acts that harmed Plaintiffs' businesses and property.

195. The predicate acts were not isolated or incidental; they were the means by which Defendants conducted the enterprise's affairs. By deploying threats, coercive pressure, and interference with Plaintiffs' business relationships, Defendants used the enterprise as the vehicle through which the racketeering scheme was executed. Plaintiffs' injuries—including economic losses, disruption of business operations, and usurpation of its autonomy—flowed directly from Defendants' operation of the enterprise through these unlawful acts.

196. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered substantial injury to their business or property, including but not limited to: diversion of funding and other resources from core mission-related non-advocacy activities, legal and consulting fees not incurred for litigation, research expenses, public relations expenses, marketing expenses, increased security expenses, enhanced training and staffing expenses, the costs of negotiating with Defendants regarding their extortionate demands, and other administrative or out-of-pocket costs incurred because of, and in response to, Defendants' unlawful conduct described herein.

**SECOND CAUSE OF ACTION**
**RICO Conspiracy**
**18 U.S.C. § 1962(d) by Conspiring to Violate 1962(c)**
**Against all Defendants**

197. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

198. Each Defendant has knowingly conspired between and among themselves and the Union Affiliates within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, each Defendant and the Union Affiliates agreed and intended, and/or adopted the goal of furthering or facilitating, the following: to facilitate, conduct or participate, directly or indirectly, in the management and operation of the affairs of the enterprise in relation to Plaintiffs through a pattern of racketeering activity unlawful under 18 U.S.C. § 1961(1), namely, multiple, repeated and continuous acts or threats against Plaintiffs and other participants in California's healthcare industry involving conduct indictable or chargeable under 18 U.S.C. §§ 1951–1952, California Penal Code §§ 182, 518–520, and 524, and California Elections Code §§ 18620–18621, in which the conspiracy of Defendants and the Union Affiliates, if successful, would result in the acquisition by Defendants of the property and property rights of CPCA and CHCs.

199. The injuries of Plaintiffs were proximately caused by Defendants' conduct in operating and managing the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Defendants used their positions within, and their relationships to, the enterprise to direct, coordinate, and carry out extortionate acts that harmed the business and property of CPCA and CHCs.



BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4070

200. The predicate acts were not isolated or incidental; they were the means by which Defendants conducted the enterprise's affairs. By deploying threats, coercive pressure, and interference with the business relationships of CPCA and CHCs, Defendants used the enterprise as the vehicle through which the racketeering scheme was executed. The injuries of CPCA and CHCs—including economic losses, disruption of business operations, and usurpation of their autonomy—flowed directly from Defendants' operation of the enterprise through these unlawful acts.

201. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered substantial injury to their business or property, including but not limited to: diversion of funding and other resources from core mission-related non-advocacy activities, legal and consulting fees not incurred for litigation, research expenses, public relations expenses, marketing expenses, increased security expenses, enhanced training and staffing expenses, the costs of negotiating with Defendants regarding their extortionate demands, and other administrative or out-of-pocket costs incurred because of, and in response to, Defendants' unlawful conduct described herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court issue a judgment in their favor and against Defendants, jointly and severally, granting:

1. General damages, the exact amount to be determined at trial, to compensate Plaintiffs for the harm caused by Defendants' unlawful conduct;
2. Trebling of Plaintiffs' damages;
3. Reasonable attorney's fees and costs;
4. Equitable relief against all Defendants, including enjoining them from engaging in violations of federal and state law of the kind described herein; and
5. Such other relief as the Court deems just and proper.

Dated: September 18, 2026

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: */s/ Emmet P. Ong*
K. LEE MARSHALL
EMMET P. ONG
ANNA V. DONALD
CELESTE X. CHARLET
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070

JOHN R. BIELEMA
(*pro hac vice* application to come)
One Atlantic Center, 14th Floor
1201 W. Peachtree St., N.W.
Atlanta, GA 30309-3471

**ATHENE LAW, LLP**
LONG X. DO
AVI RUTSCHMAN
10866 Washington Blvd., #142
Culver City, CA 90232

*Attorneys for Plaintiffs California Primary Care Association, Shasta Community Health Center, Hill Country Community Clinic, Mountain Valleys Health Centers, Centro de Salud de la Comunidad de San Ysidro Health, Inc., and McCloud Healthcare Clinic, Inc.*